## THE COMM'RS OF THE CANAL FUND *v.* KEMPSHALL.

Fresh water rivers, to the middle of the stream, belong to the owners of the adjacent banks. If *navigable* the right of the owners is subject to the *servitude of the public interest* for passage or navigation. The owners, however, are entitled to the usufruct of the waters flowing in the rivers, as appurtenant to the fee of the adjoining banks, and for an interruption in the enjoyment of their privileges in that respect, in consequence of *public improvements made by the state,* are entitled to compensation for damages sustained.*

ERROR from the Supreme Court. In the construction of the new aqueduct at Rochester, a race-way by which water was conducted from the *Genesee river* to a valuable grist-mill belonging to Kempshall was obstructed by the agents of the state, from the 20th March to the 1st day of June, 1837, whilst the arch for the aqueduct was constructing, by which he sustained damages assessed by the canal appraisers at $1,866.66. The assessment was removed into the supreme court by *certiorari.* The race-way is supplied with water by means of a dam across the Genesee river, at the distance of thirty or forty rods above the aqueduct. About four rods below the dam commences a fall of from ten to fifteen feet, followed by a succession of rapids extending one hundred and fifty rods to a fall of ninety-six feet: which distance was never navigable, except that logs were occasionally floated to a saw-mill. From the last mentioned fall there is a succession of rapids and falls

---

* *Senator* VERPLANCK, in the opinion delivered by him, insists that the principle adopted here does not conflict with the decision of this court, in *The Canal Appraisers* v. *Tibbits,* 17 *Wendell* 571, as there were facts and circumstances in that case, upon which the decision may well be sustained, which do not exist here.

He also refuses his assent to the proposition advanced on the argument of the cause, that the authority of the state over fresh water rivers, for the purposes of navigation, comprehends the right of *diverting the waters* of such streams to aid in the construction of *artificial navigation* distinct from the rivers themselves, without making compensation to the riparian owners.

for the distance of about three miles, below which the river is navigable for several miles to Lake Ontario. It is also navigable, and has been used for the navigation of boats and river craft *above* the dam, for a distance of upwards of forty miles. There is a feeder to the Erie canal, taken out of the river about two miles above the dam. The premises of the defendant are part of the large tract in the western part of this state ceded to *Massachusetts* by this state, under the compact made in 1786, by which was *granted* to Massachusetts the estate, right, title and *property* of this state in and to two hundred and thirty thousand and four hundred acres of land, *reserving only the right and title of government, sovereignty and jurisdiction.* Massachusetts, in 1788, granted this tract to *Oliver Phelps* and *Nathaniel Gorham*, who, at an early day conveyed one hundred acres *fronting on Genesee river* to one Allen, within the bounds of which are contained the premises of Kempshall, and the race-way by which his mill is supplied with water. In March, 1792, Allen conveyed the one hundred acres to one Barton, from whom Kempshall by sundry mesne conveyances derives his title. As long since as 1814 there was a mill-race, from which a mill on the one hundred acre tract was supplied with water from the Genesee river, which race has been considerably enlarged from time to time. In 1814 a wing-dam was erected at the head of the race, which, in the next year, was extended across the river, and continued until 1817, when the dam now standing was erected. The supreme court *confirmed* the assessment of the canal appraisers, and the commissioners of the canal fund sued out a writ of error. The case was argued in this court by:

*Willis Hall*, (Attorney-General,) for the plaintiffs in error.

*E. Darwin Smith* and *W. Kent*, for the defendant in error.

*Points submitted and argued on the part of the plaintiffs in error:*

I. The Genesee river is a large navigable stream, which is capable of being used, and has been used, since the settlement of the country, by the public for free navigation and other public purposes, and therefore it is a part of the common undivided property of the state.

*First.* This point was established by the decision of this court in the case of the *Canal Appraisers* v. *The People, ex rel. George Tibbits,* 17 *Wendell* 571. It has become *res adjudicata,* and ought not to be again called in question.

*Second.* The distinction which prevails in England between fresh and tide rivers, as respects the ownership of the bed, is inapplicable to this state, and has never been adopted here. The only criterion here to ascertain a public navigable river is *its navigability in fact,* not the character of its waters. 1. A very decisive proof of this proposition is found in the whole course of the administration of the government of the colony and of the state of New-York, extending from 1668 to the present time. See instances collected, 13 *Wend.* 358–9, 360–1–2, of grants of islands and lands under water, in the Hudson, Mohawk, Batten Kill, Seneca, Onondaga, Oswego, Chenango, Canada Creek, Niagara, etc. See also, Act of 5th May, 1786, § 18, (1 *Greenl. Laws* 284,) authorizing the commissioners of the land office " to grant land under waters of navigable rivers." Also, the act of 22d December, 1792, § 5, (3 *Greenl. Laws, p.* 13,) granting the lands under the water of the Hudson and Mohawk to the Western and Northern Inland Navigation Company, " as a free gift from the people." 2. Another proof that the English distinction has not been adopted here, is, that the reason of the distinction is entirely inapplicable. The king was said " to own the sea," of which the tide rivers were considered branches. *Dav. Rep.* 55. This absurd position was the origin of a distinction which, as applied to Eng-

land, was a good practical rule, because it happened to embrace almost the whole extent of all rivers which were in fact navigable; but in this country the distinction would exclude most of the navigable rivers, and be as absurd in its application as in its origin. *Carson* v. *Blazer,* 2 *Bin.* 25. *Shrunk* v. *The Pres't of Schuylkill Navig. Co.,* 14 *Serg. & Raw.* 71. *Cates* v. *Wadington,* 1 *McCord, S. C. R.* 580. No part of the common law of England has been adopted here which is not applicable to our circumstances. 1 *Black. Comm.* 107. 3. The true reason lies deeper than the positive enactments of municipal law. It is found in the organization of nations. It is, that things incapable of individual occupancy, but which may be used by all, are never appropriated to individuals, but remain in the state as a part of the commonwealth, for the benefit of all. *Vattel, b.* 1, *c.* 22, § 281: *c.* 20, § 234, 235: *b.* 11, *c.* 9, § 126. *Code Napol. art.* 538. *Pandects, lib.* 1, *tit.* 8, *art.* 2, § 9. *Huber De Jure Civ., l.* 2., § 4, *c.* 4, *sub.* 2,3,4,5. *Arnold* v. *Mundy,* 1 *Halst.* 71. *Gro. De Jure Belli, etc. l.* ii, *c.* 8, § 6. *Paley's Moral Philosophy, p.* 83.

II. Whether the absolute ownership of the bed of the river be in the people or in the riparian proprietor, the right of the people to the *use of the water for all public purposes,* is paramount to the right of the owner of the bank, or to that of any other individual. 1. The right which a state has over navigable rivers is a governmental right, held in its collective or national capacity, inseparable from its legislative or sovereign power; and such a right, in its whole extent, must from its nature be paramount. When it ceases to be paramount, it ceases to exist. *Angel on Tide Waters, p.* 37. *Arnold* v. *Mundy,* 1 *Halst.* 1, 71, 77. *Vattel, b.* 1, *c.* 20, § 245, 246. *Corp. of Georgetown* v. *Alexand. Canal Co.,* 12 *Pet.* 91. 2. By the law of nature, and by the civil and French codes, this right extends to the entire ownership and control of all navigable rivers, fresh or salt, for all public purposes whatever. *Pandects, lib.* 43, *tit.* 12, §9. *Huber De Jure Civ. lib.* 2,

**1841.**

**Comm'rs of Canal Fund v. Kempshall.**

§ 4, c. 4, sub. 4, 13. *Van Lecuwen's Comm.*, p. 115, § 2, p. 199, § 7. *Code Civ.* (*De Nap.*) art. 538. 3. The distinction in the common law of England between fresh and salt rivers, is limited to the *ownership of the bed.* The paramount right of the public, for all public uses, is as distinctly asserted and as large, by the common law, over navigable fresh rivers, as over navigable tide rivers. As far as the *public use* of navigable fresh rivers is concerned, there is no difference between the civil and the common law. *De Jure Maris,* (*Har. Law Tracts,*) 6, 8, 9, 72, 73. *Magna Charta,* c. 23. 2 *Inst.* 38. 1 *Hen.* IV, c. 12. 3 *Geo.* IV, c. 126, § 97. *Schultes on Aquatic Rights,* p. 4, 8. *Rex* v. *Grosvernor et al.,* 2 *Stark.* 448. *Vattel,* b. 1, c. 21, § 259. 2 *Black. Comm.* 39. *Warren* v. *Matthews,* 6 *Mod.* 73. *New-Orleans* v. *United States,* 10 *Peters,* 662. *Pandects, l.* 1, *tit.* 8, *art.* 2, § 9. *Mayor of Lynn* v. *Turner. Cowp.* 86. *Ward* v. *Cartwell, Willes' Rep.* 265, 268. *Gunning's Law of Toll,* p. 18. *Woolrychs's Law of Waters,* p. 33. *Rex* v. *Russell,* 13 *Com. Law Rep.* 254. *S. C.,* 6 *B. and C.* 566. *Palmer* v. *Mulligan,* 3 *Caines' R.* 307. *Hooker* v. *Cummings,* 20 *Johns. R.* 100. *Gro. De Jure, B. and P.,* b. 2, c. 3, § 9. *Bract. lib.* 1, c. 12, § 6. *Inst., lib.* 2, *tit.* 1, § 2. 4. The right of the people to use all navigable rivers in this state, for public purposes, has been repeatedly asserted by our supreme court: *Palmer* v. *Mulligan,* 3 *Caines R.* 307; *Hooker* v. *Cummings,* 20 *Johns. R.* 100; and the right to use the Genesee for public purposes, is asserted by the act declaring it a public highway. 1 *R. and K. Laws,* p. 602, § 34. 3 *Web. ed. Laws,* p. 433. 2 *R. L.* 286, § 1. Every act of the legislature regulating fisheries, and authorizing or forbidding the building of dams or bridges, is an assertion of the paramount right of the people to the use of navigable rivers for public purposes.

III. The rights of the public over the water, after it was diverted into the race, remained the same as before. 1. The waters of a public stream, or any part thereof, by be-

ing diverted into a new channel, do not change their cha-
racter. *Shultes*, 135. *Pandects, lib.* 43, *tit.* 12, § 1, § 5.
2. It is a universal rule, that water cannot be diverted from
a public navigable river without the permission of the state
in which it lies. *Vat. b.* 1, *ch.* 20, § 249. By the civil
law, *Pand. lib.* 43, *tit.* 12, § 9. By feudal law, *Craig.
jus feudale, lib.* 1, *diegesis* 16, § 11. By the common law,
applied to fresh as well as tide water, a license must be
obtained after a writ of *ad quod damnum,* executed. *Fitz.
N. B.* 225. 10 *Coke,* 141, case Isle of Ely. *Rex* v. *Rus-
sell,* 13 *Com. Law R.* 254. *Hind* v. *Mansfield, Noy.* 103.
*Attorney General* v. *Brittain* (*quoted,*) *Com. Law. R.* 260,
(6 *B. and c.* 579.) *Rex.* v. *Caldwell,* 1 *Dall.* 150. 2 *Inst.*
38, *Mag. Chart. ch.* 23. *Glan. lib.* 9, *c.* 11. 3. The
water was turned into the race by means of a dam, erected
without the authority of any legislative act. *Palmer* v.
*Mulligan,* 3 *Caines,* 307. (See numerous acts of the le-
gislature authorizing the building of dams.) 4. The de-
fendant having erected the dam and diverted the water
without the permission or consent of the public, can de-
rive no rights from his unauthorized acts as against the
public.

*Points submitted and argued on the part of the defendant
in error:*

I. The common law was in force in this state before the
revolution, and was continued by the old constitution, and
constitutes the only rule for the decision of this case. *Vide*
1 *R. S.* 31, § 35, *old Const. Vattel, B.* 1, *ch.* 18, § 210.
*Gordon's New-York Gazetteer, p.* 18, 20, 21. *New Const.
art.* 8, § 13.

II. By the deed of cession from this state to Massachu-
setts, dated December 16, 1786, this state parted with the
title to the bed of the Genesee river, to Massachusetts.
Vide " An act to appoint agents for vindicating the rights
of this state against Massachusetts," passed November 12,
1784.

1841.

Comm'rs of
Canal Fund
*v.*
Kempshall.

III. The state of Massachusetts, by its deed to Phelps and Gorham, dated November 21, 1788, conveyed to them the fee of the bed of the Genesee river; and the claimant, as a remote grantee of Phelps and Gorham, has acquired the same title.

IV. As the riparian owner, under a grant conclusive as against the state, expressly bounding him by the centre of the river, the defendant in error has an absolute usufructuary interest in the water of the river, which he may use in any way not inconsistent with the public interest in the river as a highway, (if it be one,) and of which he cannot be deprived to any extent by the state, without just compensation. " Act to provide for the improvement of the canals of this state," passed May 6, 1834. 1 *Story on Const.* 98. 3 *R. S.* 565. *Hale's Treatise de Jure Maris,* part 1, ch. 3. *Worcester* v. *State of Georgia,* 6 *Peters,* 315. *Goodell* v. *Jackson,* 20 *Johns.* 693. *Gardiner* v. *The Village of Newburgh,* 2 *Johns. Ch. R.* 162. *People* v. *Platt,* 20 *Johns.* 195.

V. The reservation in the deed of cession from New-York to Massachusetts, " of the right and title of *government, sovereignty,* and *jurisdiction,*" does not affect the question, or modify the force of these views. *Vattel, ch.* 4, § 38.

VI. The Genesee river is not a *public river* according to the rule of the common law—being neither a large navigable river in which the tide ebbs or flows, or an arm of the sea. *Vide* 6 *Cowen, ex parte, Jennings,* 528 *and note.* *Adams* v. *Pease,* 2 *Conn. R.* 481. *Hooker* v. *Cummings,* 20 *Johns.* 98. 3 *Kent's Comm.* 427, 2d ed. The legislature have recognized it as a private river. *Vide Sess. Laws,* 1834: " An act to incorporate the city of Rochester," passed April 28, 1834, *tit.* 7, § 49, *p.* 325.

VII. The Genesee river is no farther public than as respects *its use*—being subject, where it is navigable to any extent to the servitude of the *public interest,* as in the case of a *public highway.* (The legislature declared it a

highway. *Vide R. Laws*, 1813, 2 *vol.* 285, *or* 3 *R. S.* 248. 5 *Wendell*, 447, *The Canal Commissioners* v. *The People, opinion of the Chancellor as to the effect of this declaration.*) 3 *Ohio R.* 496, *Administrators of Gavit* v. *Chambers.* 17 *Wend. The Canal Comms.* v. *The Peopl* , *opin. of the Chan.* 595, *and opin. of Senator Tracy*, 626.

1841.

Comm'rs of
Canal Fund
*v.*
I··mpshall.

VIII. The Genesee river, not being navigable to any extent through the city of Rochester, is there free from such servitude, and is private property as respects its bed and the waters which flow over it, which here the riparian owner may use for any purpose. *Vide* 17 *Wend. opinion of the Chancellor, and cases cited at page* 592. 1 *Pickering's R.* 180, *Commonwealth* v. *City of Charlestown*, to the point that the *public right* is limited to what may be of *public use. Vide also* 17 *Wend.* 606, *opin. of Senator Tracy.*

IX. But if the Genesee, at the place in question, were navigable, the defendant, as the riparian owner, would nevertheless have an absolute right to use the water upon his land, so as not to interfere with the navigation; and having applied the water to a valuable use, the state could not divert it to his injury, without compensation, unless for the purpose of improving the navigation of the river itself. 1. This would be so by the *civil law. Vide Cooper's Justinian, lib.* 2, § 1, 4, 5. *Digest, tit.* 8, § 8. *L.* 43, *tit.* 15, § 1. 2. At *common law. Hargrave's Tract*, 45. *Lord Hale's Treatise de Portibus Maris. Angel on Tide Waters*, 123. 1 *Pickering*, 180, *Comm.* v. *Charlestown.* 10 *Mass. R.* 70, *Inhabitants of Arundell* v. *McCullock. Swift's Treatise*, 340, 341, 343, *cited and approved in East Haven* v. *Hemingway*, 7 *Conn. R.* 202; 17 *Wend.* 626, *per Senator Tracy.*

X. The defendant in error having sustained actual loss by the diversion of the water, was entitled to have his damages assessed by appraisers. *Ex parte, Jennings*, 6 *Cowen*, 533, 525. 1 *R. S.* 225, *old ed.* § 46; 211 *new ed.* § 50. *Sess. Laws of* 1836, *p.* 409, § 10. 5 *Wend. opin.*

of the Chancellor, *Tibbitt's case,* 452; *same case, opin. of Senator Allen,* 455, 456. 4 *Wendell,* 651, *Wheelock* v. *Young.*

XI. If, notwithstanding the express grant of the state of New-York, it shall be held that the Genesee river remained, or by any legislation of the state of New-York ever became, a *navigable river*, yet the defendant shows an absolute title by *prescription* to the use of the waters of the river for his mill; and the court is bound, under the circumstances of the case, to *presume* a title by grant of the easement enjoyed by the defendant. *Spultey on Aquatic Rights,* 132. *Davis's R.* 55. 17 *Wend.* 625, *per Tracy, senator. Gob. & Wheatly on Easements,* 19, 49, 86. *Bright* v. *Walker,* 1 *Cr. M. and R.* 217. *Keymer* v. *Summers,* 3 *Tenn. R.* 157. *Schauber* v. *Jackson,* 2 *Wend.* 13 *per Chancellor Walworth. Cowen & Hill's notes,* 383.

XII. If the state of New-York were absolute owner of the Genesee river, yet, the defendant having erected his mill and made improvements under the permission, or express or implied authority of the state, the principles of a court of equity will either protect him in the undisturbed use of his buildings and improvements, or compel the owner, on retaking the use of the river, to pay the full value of the improvements. The claim of the defendant, whether legal or equitable, was cognizable by the appraisers. 1 *Story's Eq.* 375, *and cases there cited. Canal Appraisers* v. *People,* 17 *Wend.* 606. *Act declaring certain streams highways, passed Aug.* 10, 1798. *Angel on Water Courses,* 15, 16, 17.

XIII. The defendant in error is entitled to interest from the date of the award of the appraisers, besides damages for the delay, &c. *Art.* 5 *of the Amendments to the Const. of the United States,* 1 *R. S.* 18. 2 *R. S.* 618, *old ed.* § 31, 32, 33. 2 *Cowen, Anon.* 578.

After advisement the following opinions were delivered:

The CHANCELLOR said that the state was liable for the damages sustained by the defendant in error in the diversion of the waters of the river from his mill. He had the right to hold to the middle of the stream, and even to erect buildings there if he chose to do so. The only restriction upon his right to use the bed of the river absolutely as his own, was the right of the public to navigate the stream. The Chancellor referred to the opinion delivered by him in the case of *The Canal Appraisers* v. *The People*, 17 *Wendell*, 580, as illustrating his views of the question involved in this case.

1841.

Comm'rs of Canal Fund v. Kempshall.

By *Senator* VERPLANCK. The decision of this case depends upon the right of the defendant in error to a portion of the Genesee river adjacent to his land, either as the owner of the soil of the bed of the river, or as entitled to a property or privilege in the use of its waters.

The common law governing the right of property in rivers and streams has long been settled in England. The law of maritime and fluvial property and rights, as laid down by the great authority on that head, Lord Chief Justice Hale, in his tract *De Jure Maris*, has been uniformly and repeatedly recognized and followed in the courts of Westminster Hall. Of common law right, the property of the soil, and of all aquatic privileges for fisheries, &c. in the shores and arms of the sea and in navigable rivers in which the tide flows, is in the sovereign, whilst all the uses and enjoyments are public and common. The presumption of the law is always that this original right continues, unless the contrary is shown by express proof of private right by grant or prescription. As to all fresh water rivers above the tide, the common law rule of property is the reverse; it is presumed to be private, and in the absence of proof of any other right, is always held to be in the owners of the banks, who are considered the grantees of the soil of the river's bed and of the use of the waters to the middle of the stream. Such property in

1841.

Comm'rs of
Canal Fund
v.
Kempshall.

small and wholly unnavigable rivers is strictly private and exclusive. It is as perfect as the right to the adjacent dry land, not only, as Hale says, " in property, but in use."

But the larger navigable fresh water streams are said in a phrase, drawn from the Roman law, to be " affected by servitudes of public interest," and are in their uses as public highways for passage or transportation, *publici juris.* They were termed in the old law, royal rivers, *haut streames le roy,* and in modern legal language, public rivers; not, however, (as Hale expressly says,) in reference to the property in the rivers which remain private, but to their public use. That right of property is in all respects analagous to the property in fee of any land subject to a public or private right of way or any similar easement. It is absolute and complete in every respect not incompatible with the due enjoyment of the road or path by those entitled to its use; for it is a general principle of law governing every such servitude, whether of private or public interest, that nothing passes as incident to an easement but that which is requisite to the fair enjoyment of the right. 5 *Mason, R.* 195. 3 *Kent's Comm.* 432.

But these general common law rights of ownership in the sovereign or the riparian proprietor do not exclude different specific appropriations. In the largest navigable rivers, where the tide flows and ebbs, there may yet be rights of fishery or proprietary interest in the bed or shores appropriated to private persons by absolute grant or by prescription. Thus says Hale: " Although the king hath *prima facie* the right in the arms and creeks of the sea, *communi jure,* and in common presumption, yet a subject may have such right by the king's grant or charter. He may grant that very interest itself, viz: " *a navigable river,* that is an arm of the sea, the water and soil thereof." *Hale De Jure Maris, part* 1, *ch.* 5.

Thus, too, the doctrine was held and applied in *Carter* v. *Murcot,* 4 *Burr,* 2164. Judge Yates said, " the cited cases prove that navigable rivers or arms of the sea belong

to the crown and not like private rivers to the land own-
ers on each side, and therefore the presumption lies the
contrary way in the one case from what it does in the
other.   Here it lies *prima facie* on the side of the king
and the public; but it may nevertheless be appropriated by
prescription." So also Lord Mansfield in the same case:
" It is consistent with all the cases that there may be an
exclusive privilege although in an arm of the sea.   Such a
right shall not be presumed, but is capable of being prov-
ed."   On the other hand it is equally allowed by the com-
mon law that special usage or express grant may change
the ownership of the river's bed so that, as Lord Hale says,
" one man may have the river and another the land adja-
cent."

The doctrine of the common law, thus vesting the sove-
reign with the ownership as well as the jurisdiction of tide
water streams, making other larger rivers public only as
to their uses, but private as to all proprietary interests,
and regarding the ebb and flow of the tide as the crite-
rion of original or prescriptive rights of property, was,
at the period of our separation from the British crown, (as
it still is,) the acknowledged and undisputed law of Eng-
land.   It has been repeatedly recognized by the supreme
court of this state, as the law of our own state, and has as
such received the sanction of high legal and judicial au-
thority.   Chancellor Kent, in his commentaries, and the
present Chancellor in his opinions in the case of the *Canal
Commissioners* v. *The People*, 5 *Wendell* 444, and the *Ca-
nal Appraisers* v. *The People*, *ex rel Tibbits*, 17 *Wendell*
590, have approved and defended the doctrine of our su-
preme court on this head.

But in opposition to these authorities, it has been wholly
denied that the rule of distinction between fresh and salt
water streams could apply to the large interior rivers of
this state or continent.   It was argued with great ability
by senators *Tracy* and *Beardsley*, in the *Tibbits'* case, de-
cided in this court, 17 *Wendell* 574, that the great fresh

water streams of this country are not subject to the principle of individual appropriation, as applied by the common law in England.    Judge Bronson, in his dissenting opinion, in the recent case of *Starr* v. *Child*, 20 *Wendell* 149, intimates a similar opinion.

If the *Tibbits'* case, in which this court denied damages for the destruction of certain water privileges in the Mohawk, by reason of public improvements below, must be considered as having been decided upon that ground, then the authority of this appellate court will have confirmed these opinions, and set aside the common law rules of property as to the fresh water rivers of this state.

But there were various other considerations and reasons urged in the opinion of those senators, with whom the votes of a majority of the court concurred.    It was maintained that the terms of the grant did not include the waters in question—that the original patent having been from the Dutch government, must be construed according to the civil and not the common law—that there had been a continued claim and exercise of the right of property as to the Mohawk, by this state and colony for a century, in exclusion of private right; that allowing the claimant to have been the owner of the bed of the river, yet his rights were subordinate to those of the public for all purposes of *navigation*, and that he was not entitled to damages, consequent upon the construction of works below, within tide waters, for improving the navigation of a public river, (the Hudson,) where the tide ebbs and flows.    It was expressly said by senator *Beardsley*, that " he did not consider this as the turning point of the case, enough having been shewn as to the Mohawk to overturn the claim to damages."    All or any of these reasons were sufficient, if correct, to authorize a vote for reversal, without giving the authority of that decision to the other principle contended for.    I cannot, therefore, regard that decision as an authority beyond the peculiar case of the Mohawk, as stated by one of the two members who delivered the prevailing opinions; since it is

no more declaratory of the opinion of the majority, as to the exclusive property of the state in all rivers above tide water, in derogation of private rights, than an affirmance of the decision now under review, (if unaccompanied by any resolution,) would be of the opposite doctrine, if that vote were given upon an opinion asserting all the several grounds of common law, special grant, prescriptive title, and equitable compensation maintained by the defendants in error.

1841.

Comm'rs of
Canal Fund
v.
Kempshall.

If this is, as I think it is, still an open question, I must then hold that the ancient rule of proprietary interest in rivers and streams, when undisturbed by positive grant or prescription, and the flow of the tide as the criterion of that interest, either in the people or in individuals, whatever objection there may be to the policy of the rule, having been part of the common law at the erection of the state into an independent sovereignty, was adopted with the rest and remains the law till repealed.

If it be argued, as was eloquently and ably done, that the reason of the rule does not apply to the rivers of this state, and that the rule is not only arbitrary but impolitic, I must reply, that we have no proof whatever that this rule of the common law was ever abrogated or rejected by our colonial legislature or judiciary—that by our successive state constitutions we adopted so much of the common law of England as formed the law of the colony in 1775, (*N. Y. Constitution of* 1777, *Art.* 35; *amended Const.*, *Art.* 8, § 13,) as " the law of the state, subject to such alterations and provisions as the *legislature* shall, from time to time, make concerning the same." We then took that body of laws as a whole, and as being in the main suited to our wants and habits, though probably requiring legislative alteration as to many of its rules and doctrines unsuited to our government and condition. These were left to be amended by legislative enactment, and not by judicial repeal.

The laws of entail and of primogeniture were certainly much more in hostility to the spirit of our institutions than these rules of aquatic rights; but it was never regarded as the duty, or within the power of the courts, to alter either of those rules of settlement and descent; the legislature was alone competent to do so. Moreover, in this matter the common law had reserved a power in the government itself, whereby a state like ours which had neither granted its chief rivers nor the adjoining lands, was enabled to prevent any anticipated evil, in any or every case, by express reservation in its original grants, retaining the exclusive property, as well as the jurisdiction and navigation of every large stream.

If indeed, the rule were a mere presumption of evidence, arising out of the ordinary condition of society or habits of business, like rules of presumption as to lights, ways, or the usages of commerce, such a rule might be reversed by the sound discretion of courts according to varying circumstances. There the presumption grows out of the fact of the ordinary usages and conduct of men. But this is a presumption founded upon a positive rule of property, assigning; perhaps arbitrarily, perhaps unwisely, the tide water, rivers and inlets, to the sovereign in fee in the first instance, and the fresh water rivers to private proprietors, until grants or prescription vary that disposition. It is a presumption arising, not from the varying usages of life, but out of the law of the land, and therefore to be altered only by legislation.

I am therefore of opinion, that by the common law still remaining the unrepealed law of this state, the legal title to the portion of the Genesee river, where the waters were temporarily diverted by the construction of the aqueduct, was in the proprietors of the adjacent banks, subject only to the uses of navigation so far as those waters were capable of it, and to the rights of other proprietors, above or below, to the use of the stream. The complete right to the usufruct and enjoyment of those waters for milling, or

any other purpose to which water or its mechanical power
is applicable, is appurtenant to the ownership of the soil
and banks.   The only limitation to that right is, that the
waters shall not be used, diverted or detained, so as to in-
fringe upon the same and equal rights of use and enjoy-
ment of other fluvial or riparian proprietors.   On that
ground, the defendant is entitled to damages as compen-
sation for the injury to his private property, sustained for
the public use, in the construction of an aqueduct for the
enlarged canal.

But allowing the correctness of the doctrine so ably
maintained by one of our predecessors in this court, and
conceding that the Genesee is governed by the same legal
rules of property with the Hudson in its broadest parts,
still that would not be conclusive here.

It is clear upon any view of the law, that the original
or the presumptive right of the people to the property of
the navigable rivers and their beds does not prevent actual
appropriation of proprietary interests in them to private
citizens by grants.   Therefore, according to Sir Matthew
Hale, as already cited, a subject may have a right in creeks
or arms of the sea by charter or grant, and the sovereign
power may also " grant that very interest itself, viz: a *na-
vigable* river, that is, an arm of the sea, *the water and soil*
thereof."   All the common law decisions agree in this, as
in the case of the fishery in Boyne in Ireland, *Dav. Rep.*
152, and of the Severn, in England, 4 *Burr. Rep.* 2164.
Our own statute book adopts the same principle by autho-
rizing the commissioners of our land office to make in their
discretion grants of land under water, in all our navigable
rivers, and in the bay and harbor of New-York, 1 *R. S.* 208,
*Art.* " *Of grants of land under water.*"   Now every one
of these grants, whether of common law right or by statu-
tory authority, is of the property merely.   The whole right
of government, sovereignty and jurisdiction remains unim-
paired over such cessions not included in the grant, and
not affected by it.   Now the case before us shows title in

1841.

Comm'rs of
Canal Fund
v.
Kempshall.

the defendant, not only according to the common law by a right appurtenant to and included in the fee of the adjoining banks, but also by virtue of actual grants, such as would be valid against the presumptive title of the State, if the common law rule were abrogated. Under the compact of 1786, which settled the long controversy between New-York and Massachusetts, concerning the title to a large portion of western New-York, this state by formal deed, " ceded, granted, released and confirmed to Massachusetts all the estate, right, title and property, (the right of government, sovereignty and jurisdiction excepted) which the former had to a large territory comprising the whole tract of country through which the Genesee runs, from its source to where it flows into Lake Ontario." By a legislative act of Massachusetts, the territory was, in 1778, granted to Phelps and Gorham, and became in every sense private property. By the very letter of the compact and grant, the whole bed of the Genesee passed as so much land under water, comprehended in the granted territory. The usufruct of water flowing over it, is a part of and incident to the fee. There was no exception or saving in the grant, except that of " government, sovereignty and jurisdiction." The title to the river then, must have passed just as fully as the title to the lands formerly under water about the island of Manhattan or in the bay of Newburgh, now covered by wharves and piers. The reservation of the privileges appurtenant to sovereignty, could no more involve the continued property in the waters in the one case than in the other. The public rights of navigation are indeed under the trust and authority of the state, and these are easements or servitudes which the state is bound and empowered to preserve and protect as a trustee for its citizens. Under this original grant, is shown a regular chain of title in the defendant to certain lots in that tract, bounded in express words on one side by the centre of the Genesee, and including land on the adjacent banks. Here then, I conceive, is the evidence of a posi-

tive grant, such as would have conveyed a fee in the bed of the Hudson at Poughkeepsie, and a property in the use of its waters there, subject only to the uses of commerce and navigation, had a grant been made to the original patentees of that part of the county of Dutchess.

The paper title made out is supported and attested by such a continued occupation of the bank and use of the water for thirty-five years, under claim of title to the whole, as would alone establish an adverse possession conclusive against any private claim. Although the forty years limitation reserved to the state before the Revised Statutes has not yet expired, yet it seems to me difficult to impeach such a possession supporting and evidencing a chain of regular conveyances from the state itself.

The long adverse possession is alone sufficient to give an indisputable title against all private claimants, since it exceeds the twenty years statutory limitation of private suits. But the state itself, if it were not concluded by its own grant, cannot sue for these lands under water or their issues or profits, unless the right or title had accrued within forty years, (according to the act of 1804, 1 R. L. 104, still partially in force, according to the 2 R. S. 300, § 48,) or unless the people have received the rents and profits within that term. As neither of these facts can be maintained here, then it follows according to the same statute, that "the persons holding such lands shall freely hold and enjoy the same against the said people and all persons claiming under them." The proprietary interest in the water power is a necessary incident to this freehold grant, and entitles the owner to compensation for any appropriation or suspension of these privileges for the public use.

I cannot assent to the position that the conceded common law authority of the state over such rivers for the purposes of navigation, comprehends the right to divert the waters to other purposes of artificial navigation wholly distinct from that of the river itself. The right of a public navigable highway on a river, if it be susceptible of it, or

1841.

Comm'rs of
Canal Fund
v.
Kempshall.

capable of being made so, is an easement or servitude which, like other servitudes, public or private, is to be exercised without intrusion on the other proprietary rights, beyond what is necessary for its due and fair enjoyment. To consider this right of sovereignty as involving also an unlimited right to the use of the waters for other purposes of transportation, in another direction and channel, would be in contradiction to an acknowledged principle of the law of easements, (already stated,) that nothing passes as incident to a servitude but what is needed for the sufficient enjoyment of the right " itself."

The proprietor of the bed and banks of the stream has himself no absolute property in the waters, but strictly a usufructuary interest appurtenant to his freehold. He can use the waters for his own benefit; but he may not divert them to the injury of his neighbors, or lessen their quantity, or detain them unreasonably. If such be the strict limitation of the proprietary right, can it be that the state as the trustee of a special public servitude, has a much less restricted right, and can divert or detain the waters, for other uses ? By its sovereign right of eminent domain, it undoubtedly may do so; just as its officers may, under state authority, enter upon and use the quarries or forests of private citizens for its public works; but all these exercises of sovereign authority are alike " the taking of private property for public use," which the constitution pronounces may not be done, " without just compensation."

The defendant in error farther insists that he has acquired a prescriptive right to the use of the waters for his mills, even if it be conceded that the absolute property of the river is in the state. The evidence in the case is quite sufficient to establish such a prescriptive right as an easement or privilege in the soil or waters of any other private citizen; but it does not reach to the forty years rule of limitation formerly necessary to bar the claim of the state in real actions, preserved by the *45th section of title* II. *chap.* IV. *of the R. S.* which continues the application of

the former statute to all " cases where the right of action shall have accrued or the right of entry shall exist," at the time when the Revised Statutes took effect. I have besides, doubts whether the rule of prescription drawn from the analogy of the statute of limitations and establishing the same term of exclusive enjoyment, vesting or proving a prescriptive right in the land of other citizens for any special purpose, can extend to an adverse prescription against the state. The prescriptive rights against the Crown which are sustained in the English courts are not gained by twenty or forty years use, but by an immemorial usage. The privileges which would be easements or servitudes with respect to the lands of a private citizen, would commonly be " franchises or liberties" in respect to public property, and these are expressly excluded from the statute of limitations. Nor does the presumption of evidence in the view that I regard it, (*see opinion in Post* v. *Pearsall*, 21 *Wendell* 474,) apply with the same force to exclusive use and prescriptive right against the state, that it does to private property. It is a legal as well as probable presumption, that a long use of a privilege on another man's land, authorizes the belief that there has been a grant of the privilege. But this presumption, unquestionably just against private persons, can rarely have such a moral probability as against the state.

It has also been contended that the acknowledged principle of equity which protects the possession of improvements made on another person's soil, with his presumed knowledge or implied permission, or else enforces full remuneration, would sustain this claim and award of the appraisers. Here, too, I think that the unquestionable equity of the rule between individuals is founded upon reasons that do not commonly hold good in regard to the state. The present case may be an exception, since the circumstances are peculiar. But I should be reluctant to apply the principle to the state, without maturely con-

sidered qualifications, lest it might establish a precedent for other and less meritorious claims.

The view I have before taken of the proprietary interests of the defendant in the Genesee river, is sufficient, if correct, for all the purposes of this case. I therefore content myself with this general expression of opinion or rather of doubt, in relation to the two grounds of claim last noticed.

The decision of the supreme court ought, in my judgment, to be affirmed.

On the question being put, *Shall this judgment be reversed?* all the members of the court present, who had heard the argument of the cause, answered in the *negative.* Whereupon the judgment of the supreme court was AFFIRMED.