Walworth, Chancellor.
The decision of a majority of this court in the case of The Canal Appraisers v. The People ex rel. Tibbitts, (17 Wend. 590,) although put upon other grounds by some of the members who voted for a reversal of the decision of the supreme court, cast a shade of doubt upon the question whether the common law rule prevailed here as to the construction of conveyances of lands bounded by or upon a river or stream above tide waters. That doubt, however, is probably removed by the recent decision of this court in the *373 case of The Commissioners of the Canal Fund v. Kempshall, (26 Wend. Rep. 404,) in which the judgment of the supreme court in favor of the riparian owner was unanimously affirmed. The common law rule, as I understand it, is that the riparian proprietor is prima facie the owner of the alveus or bed of the river adjoining his land, to the middle or thread of the stream ; that is, where the terms of his grant do not appear and show that he is limited. And when by the terms of the grant to the riparian proprietor he is bounded upon the river generally as a natural boundary, or, in the language of Pothier, where the grant to the riparian proprietor has no other boundary on the side thereof which is adjacent to the river but the stream itself, the legal presumption is that his grantor intended to convey to the middle of such stream ; subject to the right of the public to use the waters of the river for the purposes of navigation in their accustomed channel, where they are by nature susceptible of such use. It has also been decided that the same principle applies to the construction of grants bound • ed generally upon highways, party-walls, ditches &c., which constitute natural boundaries between the lands granted and the adjacent property. Thus, in Jackson v. Hathaway, (15 John. Rep. 454,) although by the terms of the grant in that case the supreme court considered the whole of the highway as excluded, Mr. Justice Platt, who delivered the opinion of the court, says : u Where a farm is bounded along a highway, or upon a highway, or as running to a highway, there is reason to intend that the parties meant the middle of the highway.” So in Warner v. Southworth, (6 Conn. Rep. 471,474,) where the grantor had divided one of his lots from another by an artificial ditch and embankment, and afterwards conveyed one of those lots by a deed which bounded it upon the ditch generally, without any words of restriction, the court of errors in our sister state of Connecticut decided that the grant extended to the middle of the ditch. And Judge Daggett, in delivering the opinion of the court in that cáse, says : “ Doubtless had the boundary line been a stone-wall, six feet in width at the bottom, *374 the grant would have extended to the centre of it.” (See also 3 Kent’s Com. 432.)
Although this principle exists as to the construction of grants which are unrestricted in their terms, and also as to the legal presumption of ownership by the riparian proprietor where from lapse of time or otherwise the terms of his grant from the former or original proprietors cannot be ascertained, there can be no doubt of the right of the general owner of the bed of the river, as well as of the land upon its banks, so to limit or restrict his conveyance of the one as not to divest himself of his property in the other. Lord Chief Justice Hale, in his learned treatise Be Jure Maris, See., admits that the prima facie presumption of ownership of the bed of the stream by the riparian proprietor may be rebutted by evidence that the contrary is the fact. He says, “ one man may have the river and others the soil adjacent, or one may have the river and soil thereof, and another the free or several fishing in that river.” (See Harg. Law Tr. 5.) And the learned and venerable commentator upon American law says, it is competent for the riparian to sell his upland to the top or edge of the bank of a river, and to reserve the stream or the flats below highwatermark, if he does it by clear and specificboundaries. (3 Kent’s Com. 434.) This was also expressly decided by Mr. Justice Washington in the circuit court of the United States for the third circuit, in the case of Den v. Wright, (Peter’s C. C. Rep. 64,) where the owner of the alveus or bed of the creek, and also of the adjacent land upon the south bank thereof, had' conveyed 29 acres in the bed of the creek, bounded by the sides of the same, without any of the land upon either of the adjacent banks. In the case of Dunlap v. Stetson, (4 Mason’s Rep. 349,) in the circuit court of the United States for the first circuit, where the lands granted, instead of being bounded on the Penobscot river generally, were-described as commencing at a stake and stones on its west bank,, and after running on the other sides of the lot certain courses and distances to another stake and stones on the same bank of that river, and thence upon the hank at highwater-mark, to the *375 place of beginning. Judge Story decided, that the flats between high and lowwater-mark were not conveyed by the deed ; although by a colonial ordinance; which was recognized as the existing law of the state, grants bounded generally upon tide waters carried the grantee to lowwater-mark. A similar decision was made by the supreme court of Massachusetts in the case of Storer v. Freeman, (6 Mass. Rep. 435.) In that case one of the conveyances described the lines as running to the shore of Gamaliel’s Neck, and thence by the shore &e. And in the other deed these lines were described as running to a heap of stones at the shore of the neck, and thence by the shore to the land conveyed by the first deed. And in the case of Hatch v. Dwight, (17 Mass. R. 298,) the same court decided that where land was bounded by the bank of a stream, it necessarily excluded the stream itself. In delivering the opinion of the court in that case, Parker, C. J. says, that the owner may undoubtedly sell the land without the privilege of the stream, u as he will do if he bounds his grant by the bank.”
Running to a monument standing on the bank, and from thence running by the river or along the river &c., does not restrict the grant to the bank of the stream; for the monuments in such cases are only referred to as giving the directions of the lines to the river, and not as restricting the boundary on the river. If the grantor, however, after giving the line to the river, bounds his land by the bank of the river, or describes the line as running along .the bank of the river, or bounds it upon the margin of the river, he shows that he does not consider the whole alveus of the stream a mere mathematical line, so as to carry his grant to the middle of the river. And it appears to me equally .clear that the grant is restricted where it is bounded by the shore of the river, as in the present case.
The shore.of tide water is that portion of the land which is alternately covered by the water and left bare by the flux and reflux of the tide. Properly speaking, therefore, a river in which the tide does not ebb and flow has no shores, in the legal sense of the term. It has ripam but not littus. The *376 term shores, however, when applied to such a river, means the river’s banks above the lowwater-mark ; or rather, those portions of the banks of the river which touch the margin or edges of the water of the stream. A grant, therefore, which is bound-ed by the shore of a freshwater river, conveys the land to the water’s edge, at lowwater; and, as in the case of lands bounded upon tide waters, that boundary of the grant is liable to be changed by the gradual alterations of the shore by alluvial increment, or the attrition of the water.
The fact that the premises conveyed in this case are described in the deeds as mill-lots, cannot operate to extend the grants into the alveus or bed of the river. "For the deeds also show that the contemplated mills were to be supplied with water from the mill-race already constructed ; and not by water to be taken out of the Genesee river, opposite the lots granted. And the right to discharge the water into the river, after it has been used to propel the machinery on the mill-lots, is at most but an easement ■, not requiring for its enjoyment the ownership of any part of the bed of the stream by the grantees. Upon the question, therefore, whether the bed of the river passed by those deeds, I concur with Mr. Justice Bronson, in the opinion given by him in the court below, dissenting from the conclusion at which his two associates on the bench had arrived.
For that reason I shall vote to reverse the judgment of the supreme court, and to award a venir.e de novo ; to the end that the jury may ascertain the part of the premises in controversy above ordinary lowwater-mark, if any, which was in possession of the defendants in the court below at the time of the commencement of this suit. And if a majority of the court should concur with me in supposing that the judgment which was rendered by the supreme court should be reversed, it appears to be a case where the costs of this writ of error may very properly be left to abide the event of the suit upon the venire de novo which must then be awarded.
*377 Bockee, Senator=
Both parties in this case claim title under Nathaniel Rochester, who was seised in fee of mill-seat-lot No. 12, bounded by the Genesee river on the east. It is admitted that the words of description in the partition deed between Carrol, Fitzhugh and Rochester, gave to the latter the centre of the Genesee river as his eastern boundary. Rochester conveyed to Cobb parcel of mill-seat-lot No. 12, and the material part of the description of the premises is the line running “ eastwardly to the Genesee river, thence northwardly along the shore of the said river • to Buffalo-street.” •Similar words of description are contained in the deed from Rochester to Morgan. The defendants show themselves entitled to all the rights of Cobb and Morgan, the grantees of Rochester; and if the construction contended for by the defendants and adopted by the supreme court be correct, they are the rightful owners of the whole of lot No. 12, extending to the centre of the Genesee river, excepting the alley reserved on the south side of the lot. In reference to the ques tion arising in this case, there is no foundation for the distinction which is suggested between city-lots and larger tracts of land in the country. Whether the tracts of land are large or small, whether lying in the city or the country, the same rules of justice and sound legal construction ought to be applied. Neither can the rights of the owner of land be extended laterally upon the same principle that they extend upward usque ad ccelum, and downward ad infernos. This lateral extension might make some difficulty between landed proprietors. The question is, whether, according to the settled legal rules of construction, the land under the waters of the Genesee river as far as the centre thereof, is included in the conveyances under which the defendants in error claim title. The south line of the lot is described as running u to the Genesee river, ” which, according to the language of all the authorities, means the centre of the river. The rive.r may be considered as a mathematical line dividing the possessions of the opposite proprietors. Being at the central point of the river, the line runs *378 “ northwardly along the shore of said river to -Buffalo-street.” These words, in the connection in which they stand, do not necessarily and expressly limit the grantees to the western margin of the river. They may be construed, that the line shall run northwardly in the general direction of the shore. This construction is aided by the presumptions of law in favor of the riparian owner. It is also aided by the circumstance that the premises are a 66 mill-seat-lot”—-so conveyed to Rochester, and so conveyed by him—and that it is expressly entitled to certain hydraulic privileges. And although the water is to be taken from the river above this lot and conveyed to the premises by a race-way, it may fairly be presumed that the water, after being used, canno't be returned to the raceway, or discharged upon Buffalo-street. It seems to be necessary to the enjoyment of the privileges granted, that there should be a point of discharge into the Genesee river. It may be inferred from the case, that the premises in controversy are now valuable for building purposes. May not the river owners, by embankment or by building, deprive the owners of the mill-seat-lot of a large portion of the value of their property^ by preventing the use of the waters intended to be secured to them 1 The difficulties of any other construction than that which I have given to these deeds, would be almost insurmountable* Reasons founded on public policy and general convenience forbid the disjunction of the ownership of the bed of the river and the adjacent land. It would in many instances present a line of boundary as uncertain and variable as the edge of a cloud. Although one may own the land, and another the adjacent stream or the land covered by it, yet the intendment of the common law will apply in favor of the riparian proprietor in all cases where there is no evidence to rebut it; and will equally apply in all cases even of doubtful construction. My opinion is, that the fair and reasonable construction and legal effect of the conveyances from Rochester to Cobb and Morgan carry the grantees td the centre of the Genesee river, and that the judgment of the supreme court ought to be affirmed.
*379 Bradish, President.
This case is simply one of the construction of an express grant of land. And although both in the opinion of the court below by Justice Cowen, and the dissenting opinion of Justice Bronson, the important question of the applicability of the common law of England to the navigable rivers of this state was discussed at considerable length, yet it seems to me that this case does not embrace that question; and that our decision, therefore, must turn on considerations altogether distinct from, and independent of it. Eor in whatever way that interesting and important question, which I consider still an open one in this state, may finally bve decided; whether the proprietary interest in the beds of our navigable rivers and lakes, not tide waters, shall be decided to be in the people collectively, or in the riparian owner, it is conceded by all that this right may be acquired by private individuals under express grant, pr plaimed by prescription. This is sufficient for the purpose^ of the present case : for it is admitted that previous to the 13th of August, 1817, Charles Carroll, William Fitzhugh, dnd Nathaniel Rochester, were jointly seised of a tract of land, embracing the premises in question to the thread of the stream ; and that they were the common source of the title of both the plaintiffs and defendants. On the 13th of August, 1817, Charles Carroll, William Fitzhugh and Nathaniel Rochester made partition of their joint interest:; and mill-seat-lot No. 12, embracing the premises in question, was assigned, and duly conveyed to Nathaniel Rochester. On the 9th of November, 1819, Rochester conveyed a part of said lot tp William Cobb, describing it as follows ; “ Beginning &c. at the northwest corner thereof, on the sputh bounds of Buffalo-street, running thenpe southwardly alppg the east bounds of the mill-yard, and at right angles with Buffalo-street, thirty feet; thence eastwardly parallel with Buffalo-street, about forty-five feet to the Genesee river 5 thence northwardly along the shore of the said river, to Buffalo-street; thence along the south bounds of Buffalo-street westwardly to the place of beginning.” On the same day Rochester convey *380 erl another part of the said lot to Thomas Morgan, describing it as follows : “ All that certain piece or parcel of mill-seat-lot No. 12, beginning &c. at the southwest corner of that part of the said lot No. 12 this day sold and conveyed to William. Cobb, running thence southwardly along the east bounds of the mill-yard, twenty-five feet; thence eastwardly along the north bounds of an alley, and parallel with Buffalo-street, to the Genesee river (nearly fifty feet) ; thence northwardly along the shore of the Genesee river to William Cobb’s corner; thence along the south bounds of the said William Cobb to the place of beginning.” By sundry proceedings and mesne conveyances, the premises embraced in these two grants became the property of the defendants in error.
It will thus be perceived that the question in this case is simply one of the construction of these two grants, and as to the extent of the premises which passed under them. The defendants in error insist that, together, these grants conveyed the lot to the thread of the stream, and so the supreme court has decided ; while the plaintiffs in error contend, that they conveyed the lot only to the shore of the river, leaving still in the grantor the residue of the lot between the shore of the river and the thread of the stream.
The case seems to me very clear both upon principle and authority. As the south boundary lines of the two grants ran to the Genesee river generally, if they had been without subsequent qualification and restriction, they would, by a well settled and uniformly acknowledged rule of construction, have extended to Üieflum aguce, or thread of the stream. But when the east boundary lines came to be described as running along the shore of the river, this fixed the termini of the south lines., and limited the grants to the shore, instead of the thread of the stream. Though the term shore is technically applicable only to the sea, to lakes, or other large bodies of water ; yet, in its judicial and popular application to rivers, it is, by elementary writers, the adjudications of the courts, and in common understanding, as clearly defined, as well settled, and as universally *381 recognized, as is the filum aquae, or thread of the stream ; and a grant of land bounded generally on, or running along a private stream, would not more certainly carry the grant to the thread of the stream than would a grant bounded by, and running along the shore of such stream, be limited to the water’s edge or margin of the stream. To consider the expressions ££ along a stream,” and u along the shore of a stream,” as meaning the same thing, would be to render identical things entirely different, and to confound distinctions well settled and uniformly recognized. In Hatch v. Dwight and another, (17 Mass. R. 289,298,) Parker, Ch. J. says : ££ The owner may sell land without the privilege of the stream, as he will if he bounds his grant by the banks.” And again : ££ The land released is limited to the bank of the stream, which necessarily excludes the stream itself.” He cited approvingly Storer v. Freeman, (6 Mass. R. 435,) before Ch. J. Parsons, where it was held, that a conveyance of land described as running to the shore, and thence by the shore, did not include the shore, or the flats between high and lowwater-mark. So in the case of The Canal Appraisers v. The People, (17 Wend. 596,) Chancellor Walworth says : ££ There cannot be a possible doubt that if I am the owner of lands on either or both sides of a stream, whether the same be navigable or otherwise, and am also the owner of the bed of the stream itself, I may convey the land on either side, or both, in such a manner as to retain or reserve to mysslf the bed of the river or stream, and the islands therein, if any such there should be.” Speaking of certain military bounty lots, he says : ££ Where such lots are situated on the banks of navigable rivers, they are bounded on the banks of such rivers or streams, and run thence along the bank of such stream. This is a clear indication of the intention of the grantors that the patent should not include any part of the alveus of the stream, or of the islands therein. It is, therefore, a limited grant, within the meaning of that term, as used by waiters on the civil law, and it cannot be extended to the *382 thread of the stream, or include any island therein, even on the common law principle.” (Id. 599.)
Analogous to this is the adjudged and settled law in relation to grants of land bounded by a highway or partition wall generally ; and those bounded by, and along the side of such highway or wall. In the former case, the grants extend to the centre of the highway or wall; but in the latter, they would , be limited to the sides of such highway or wall, leaving still in the grantor the wall and the fee of the land over which the highway pas.ses, subject only to the easement or public right of way. In the absence of proof to the contrary, the law indulges a prima facie presumption that the riparian owner of land on a private river is also the owner of the. bed of the stream to the filum, aquae. But there is no presumption against direct proof, nor .any prima facie intendment in the presence of an express grant. Such grant fixes its own limits, and determines the rights of the parties under it. u Expressum facit cessare taciturn,” and ^ conventio vincit legem f are sound max-' ims in the law, and are applicable in this case.
With great deference to .the learned judge who delivered the opinion of the court below in this case, I cannot admit it to be correct, either upon principle or authority, that when the law has once fixed the proprietorship of the shore or bank of a private river, “ the soil of the river follows, as an incident, or rather as a part of the subject matter, usque filum aqum.” The bed of a private river is a substantive matter of grant; and can only pass as such. It can never pass as incident or appurtenant to a grant, It is land, and land cannot be incident or appurtenant to land. A conveyance of one acre of land can never be made, by any legal construction, to carry another acre by way of incident or appurtenance to the first. That land, and that only, which is expressly embraced in, and forms the subject matter of a grant, passes under it.
• The two grants in question were bounded on the east by the shore of the Genesee river. They were, therefore, strictly limited by that shore, leaving still in the grantor, now repre-. *383 sented by the plaintiffs in error, the bed of the river opposite the lands granted, from the shore to the thread of the stream. This latter constitutes the premises in controversy in this case $ and to which the defendants in error have shown no title, nor any right of recovery.
The judgment of the supreme court, therefore, so far as it recognizes such title or right, is erroneous and should be reversed.
Root, Senator, also delivered a written Opinion itt favor of reversing the judgment of the supreme court.
On the question being put, “ Shall this judgment be reversed 1” the members of the court voted as follows.
For reversal: The President, the Chancellor, ahd Senators Clark, Ely, Franklin, Peck, Root, Scott, Strong, " Varían and Varney—11.
For affirmance: Senators Bartlit, Bockee, Denniston, Dixon, Hunt, Johnson, Nicholas, Platt, Ruger and Works -10-.
-Judgment reversed;