WATERFORD ELECTRIC LIGHT, HEAT AND POWER COMPANY, Appellant, Respondent, v. THE STATE OF NEW YORK, Respondent, Appellant.

Third Department, March 11, 1924.

Waters and watercourses — appropriation by State for canal purposes of lands and water power on Hudson river at Van Schoenhoven rapids above Waterford — Hudson river at point where appropriation was made is navigable — appropriation by State of river banks at waterfall is appropriation of interest in undeveloped water power — Laws of 1901, chap. 164, giving claimant right to erect dam in Hudson river at Van Schoenhoven rapids and transferring any interest State had in lands under water is valid — said grant did not unreasonably or substantially limit navigation — State cannot, as between itself and claimant, raise contention that claimant had no license to build dam under River and Harbor Appropriations Act of March 3, 1899 (30 U. S. Stat. at Large, 1151, § 9) — value of water power less cost of development is measure of damages — State in diverting water for canal purposes was not improving navigation of river — interest allowed on award from date of first appropriation of land.

The Hudson river at Van Schoenhoven rapids above the village of Waterford is a navigable stream.

The owner of the banks of the stream at a waterfall is the owner of the undeveloped power thereof and, therefore, when the State appropriated claimant's land on both sides of the Hudson river at Van Schoenhoven rapids it appropriated an interest of value in an undeveloped water power and not merely the land which composed the banks.

Chapter 164 of the Laws of 1901, which granted to the claimant and its successors authority to construct a dam across the Hudson river at Van Schoenhoven rapids and to maintain said dam and flood back the waters of the river, and which transferred to the claimant any interest of the State in lands under the waters of said river covered by the dam or which might be flooded by the erection thereof, is valid and vested in the claimant a proprietary interest in the river at the point in question.

Said grant to the claimant did not unreasonably or substantially limit the navigation upon the Hudson river, since it appears that below the rapids in question there was a dam at Troy, having an elevation of more than twelve feet and that between Troy and Fort Edward, a distance of forty miles, there were six other dams, so that at the time said statute was enacted, continuous travel upon the river between Troy and Fort Edward had become impossible and had ceased. Furthermore, the erection of a dam at the rapids by the claimant would have improved navigation between that dam and a dam about four miles up the river.

The contention by the State that the undeveloped water power at the rapids was of no value to the claimant since it could not have built a dam there without a Federal license under the River and Harbor Appropriations Act of March 3, 1899 (30 U. S. Stat. at Large, 1151, § 9), cannot be raised to avoid the payment of compensation, since the State has appropriated the claimant's water rights to build and has actually built the very dam which it urges was prohibited by the Federal statute.

18

The value of the water power, developed through the agency of the State dam, less the cost of development, is the value of the thing taken from the claimant and is the measure of compensation to be paid to it for the appropriation of the water power.

The further contention by the State that the riparian rights of the claimant were held subject to the paramount right of the State to improve navigation is without merit, since that right exists in the State only where the improvement is to the river itself and does not exist where the State diverts the water of the river for the purposes of maintaining an artificial canal, especially when it is considered that the State has not limited itself to the erection of a dam, the construction of a canal and lock and the diversion of water sufficient to operate the same, but has seized for all purposes whatsoever all the property and rights of the claimant.

The claimant is entitled to interest on the entire award from the date of the earliest appropriation of land on the easterly side of the river immediately above the easterly end of the dam which the State has erected, for it was, at that time, that the State deprived the claimant of its water power.

VAN KIRK, J., and COCHRANE, P. J., dissent, with opinion.

CROSS-APPEALS by the claimant, Waterford Electric Light, Heat and Power Company, and by the defendant, The State of New York, from a judgment of the Court of Claims, entered in the office of the clerk of said court on the 20th day of February, 1922, awarding compensation to the claimant for lands upon the Hudson river and riparian rights therein appropriated by the State for Barge canal purposes.

The opinion of the Court of Claims is reported in *Waterford El. L., H. & P. Co.* v. *State of New York* (117 Misc. Rep. 480).

*Thomas O'Connor* [*George E. O'Connor, W. S. Ostrander, John L. Wells, Charles A. Collin* and *Gerald W. O'Connor* of counsel], for the claimant.

*Charles D. Newton, Attorney-General* [*Edward J. Mone* of counsel], for the State of New York.

H. T. KELLOGG, J.:

The claimant, prior to the year 1910, was the owner of both banks of the Hudson river at Van Schoenhoven rapids. These rapids were a short distance above Waterford, and were the first rapids in the Hudson river above the confluence of the Hudson and the Mohawk. There was here a natural drop of nine feet, distributed through a distance of one-half mile. About four miles above there was a water power belonging to the Hudson River Power Transmission Company. The Van Schoenhoven rapids were susceptible of development to constitute a valuable water privilege. A dam erected at Split Rock would have furnished a head of thirteen feet. By means of such a dam 5,000 horse power on the average could be developed. Such a dam would not have minimized the water privilege of the Hudson River Power Transmission Company, or set back the waters to overflow lands other

than those owned or controlled by the claimant. These lands reached upstream for about two miles, and had an acreage of 163.68. The canalization of the Hudson river from Waterford to Fort Edward, as prescribed by chapter 147 of the Laws of 1903, necessitated the erection by the State of New York of a dam at Van Schoenhoven rapids, in order that the waters above might have a depth sufficient for the passage of boats with a draft of not more than twelve feet. In the years from 1910 to 1913 the State appropriated all the lands and rights of the claimant at Van Schoenhoven rapids. It erected a dam at Split Rock and constructed a canal and lock to enable vessels to pass the dam. These structures were in part built to the west of the western boundary line of the Hudson river on lands previously owned by the claimant. The waters of the river, drawn from the pond created by the dam, are now utilized to fill the canal and lock thus built, and to operate the lock. Through this development the waters of the Hudson river are diverted to flow in an artificial channel outside the natural river channel for a distance of about 5,000 feet. The claimant filed its claim for damages on account of the appropriations made. It claimed the right to recover not merely the value of its uplands, but as well the value of the water power at Van Schoenhoven rapids. The Court of Claims found that the claimant was so entitled, and determined the value of its properties and rights to be $250,000. It allowed to claimant the amount named together with interest from June 30, 1913. The State appeals asserting that the claimant's right of recovery should be limited to the value of its uplands. The claimant appeals, asserting that it is entitled to interest upon the principal sum awarded from March 17, 1910, rather than from June 30, 1913.

In the early cases in this State, as well as in other jurisdictions, the statement was frequently made that under the common law of England non-tidal rivers were not navigable. The statement first appeared in an opinion by Chancellor KENT in *Palmer* v. *Mulligan* (3 Caines, 307). " Chancellor KENT originated a theory that at common law only tidal streams were navigable." (Farnam Waters, § 23a.) The theory thus advanced was adopted by Angell in his book on Water Courses (6th ed. § 542), and thereby gained general currency. (Id.) This doctrine was reasserted by many judges in this State, notably, by Vice-Chancellor GRIDLEY in *Varick* v. *Smith* (9 Paige, 547); by Mr. Justice BRONSON in *Starr* v. *Child* (20 Wend. 149); by Senator BEARDSLEY in *Canal Appraisers* v. *People* (17 id. 571); by Judge SMITH in *Morgan* v. *King* (35 N. Y. 454); and by Judge GRAY in *Fulton Light, H. & P. Co.* v. *State of New York* (200 id. 400). The correctness of the doctrine was doubted by

**276** Waterford El. L., H. & P. Co. *v.* State of New York.

Third Department, March, 1924. [Vol. 208

Davies, J., in *People ex rel. Loomis* v. *Canal Appraisers* (33 N. Y. 461), and by Ruger, Ch. J., in *Smith* v. *City of Rochester* (92 id. 463). Modern opinion declares that under the English common law non-tidal rivers, *navigable in fact*, were likewise *navigable in law*. (Farnam Waters, § 23; 42 L. R. A. 305, see note at p. 316.) Farnam says: " The rule that navigable water is *not* synonymous with or limited to tidal water dates back in England to the very earliest reports on record." Citing many English authorities he states the common-law rule to be, and always to have been, as follows: " A stream is navigable *in fact* and *in law* when it is capable in its natural and ordinary volume of water of transporting in a marketable condition the products of the contiguous country." (§ 23e.) The L. R. A. note states: " The courts have generally adopted the rule which is alike that of the common and of the civil law, that *navigability in fact is navigability in law*. This has generally been in the face of Chancellor Kent's doctrine, which has been stated only to be repudiated." Certainly no trace of the doctrine can be found in Sir Matthew Hale's Treatise, which is quoted in full by Judge Cowen in his note to the case of *Ex parte Jennings* (6 Cow. 518, 539). Hale is quoted as saying: " There be other rivers, as well fresh as salt, that are of common or public use, for carriage of boats and lighters. And these, whether they are fresh or salt, whether they flow and re-flow or not, are *prima facie publici juris*, common highways for man or goods, or both, from one inland town to another." It can, of course, make no difference whether a river capable of navigation be termed " navigable in law," " navigable in fact " or " public," provided the status of such a river, as to private and public rights, be the same. That the common law did not regard " navigable " as synonymous with " tidal " should nevertheless be borne in mind, since the contrary opinion, enter-tained by many judges, may account for the widespread belief that the law of England in reference to fresh waters was not suitable to this nation. Hence, perhaps, the holdings that the beds of certain streams belonged to the people rather than to the " riparians or heritors of the banks." Otherwise the opinion might have prevailed that the English common law was perfectly adapted to our needs. It was a law which seems justly to have apportioned rights in navigable fresh rivers to the riparians and to the public at large, furnishing to the former the land proprietorship and to the latter easements of passage. It enabled water powers to be developed for the production of articles of commerce; whereas it preserved the water passages that their transportation might commodiously and cheaply be made. Certainly a means of trans-portation is worthless if there be nothing to transport.

" The true rule is, that the public have a right of way in every stream which is capable, in its natural state and its ordinary volume of water, of transporting, in a condition fit for market, the products of the forests or mines, or of the tillage of the soil upon its banks. It is not essential to the right that the property to be transported should be carried in vessels, or in some other mode, whereby it can be guided by the agency of man, provided it can ordinarily be carried safely without such guidance. * * * If it is so far navigable or floatable, in its natural state and its ordinary capacity, as to be of public use in the transportation of property, the public claim to such use ought to be liberally supported." (Per SMITH, J., in *Morgan* v. *King*, 35 N. Y. 454.) The correctness of this doctrine is universally conceded. Nevertheless it has been held that the Raquette river, the Saranac river and the Black river are not navigable or public streams. (*Morgan* v. *King, supra; People* v. *Platt,* 17 Johns. 195; *Munson* v. *Hungerford,* 6 Barb. 265.) The Hudson river, however, at points between Waterford and Fort Edward is said to be navigable. It is said to be navigable at Stillwater. (*Palmer* v. *Mulligan, supra.*) It is said to be navigable at Fort Miller. (*Harris* v. *Thompson,* 9 Barb. 350; *Thompson* v. *State of New York,* 204 App. Div. 684.) It is said to be navigable at Mechanicville. (*West Virginia Pulp & Paper Co.* v. *Peck,* 189 App. Div. 286.)

It is self-evident that the Hudson river, somewhere in its windings between Waterford and its source near Mount Marcy, ceases to be navigable, and, like the Raquette and the Saranac rivers, becomes a private stream. Although it has been authoritatively held, therefore, that the Hudson, at points above the properties of the claimant, is navigable, it may be well to make reference to some of the proof which evidences its navigability in the early days of our history. That proof will show the Hudson in its natural state, and indicate the extent and character of its use at a time when navigated without artificial aid.

The State introduced in evidence many documents and maps relating to the early navigation of the Hudson. (1) A deposition made by Nanning Harmentsen and others on September 7, 1687. Harmentsen and his associates therein describe a journey from Albany to Quebec and return made prior to the year 1687. They state as follows: " The Examinants declare that four of them in number made their escape in the night from Quebecq and came in five dayes time to Albany all the way by water except one carrying place of about three Dutch miles and another of about 150 paces." (2) A report from Mr. Livingston to the government of Connecticut, dated April 11, 1690. Livingston says " the whole jurney to Canida from Albany can be performed by water except att the

carrying place where ye Canoe is to be carried ten English miles wee must turn our tradeing into warring and instead of loading our Canoes with goods for Canida for Beaver as formerly wee must load ye Canoes with provisions and ammunityon to be revenged of our cruel and perfidious Enemies." (3) Certain pages from Bascom's " The Fort Edward Book." Bascom describes a trip by General Winthrop from Albany to Canada made by boat in the year 1690, via the Hudson river, and quotes extensively from writings by Winthrop in relation thereto. Winthrop describes the rapids both above and below a place which he terms " Still Water." He mentions Fort Miller, which he terms " Little Carrying Place." He relates that he came to Fort Edward, which he terms " Great Carrying Place." He says that at this point " we overtook the Dutch Companyes, carrying their canoes over the Great Carrying Place on their backs, about twelve English miles." Bascom also refers to an expedition made by Sir William Johnson in 1755. Johnson dates a letter from the " Great Carrying Place." Bascom says: " General Johnson sent thirty wagons from the Carrying Place to Stillwater to lighten the batteaux because the water was so shallow there." (4) Certain pages from " Historic Highways of America " by Hulbert. Hulbert, describing forts built at Stillwater, Fort Edward, Fort Ann and Lake George in the early part of the eighteenth century, says: " This chain of forts from Albany to Montreal, guarding the important passageways and water, marks the line of what was known as the ' Grand Pass from New York to Montreal.' " Hulbert describes a certain map drawn about 1720 wherein a route from Albany to Canada is given. The route is described as follows: " 1. To Sprouts or first landing by water 10 miles. 2. To fort Ingoldsby by land when rivers low 14 miles. 3. To a falles by water first carrying place of ½ mile over, 17 miles. 4. To falles by water 2d carrying place of ½ m. 4 miles. 5. To fort niccolson by water this is the 3d carrying place now we have Hudson's river 12 miles. 6. Goe to the camp att wood creeke 16 miles." (5) Pages from " The History of the Five Indian Nations of Canada " by Hon. Cadwallader Colden, published in 1747. These contain a memorial made in November, 1724, describing the commerce carried on between Albany and Montreal. The memorial says: " There has been an Account kept of nine hundred Pieces of Strouds transported thither in one Year, besides other Commodities of very considerable value. The distance between Albany and Montreal is about two hundred Miles, all by Water, except twelve Miles between Hudson's river and the Wood-Creek, where they carry their Bark Canoes over Land and about sixteen miles between Cahmbly and LaPrairie,

over against Montreal." (6) Extracts from "Travels into North America" by Peter Kalm. The author describes a trip made by canoe up the Hudson river in the year 1749. He gives a description of the canoes then in use, which he says were hollowed out from a single piece of wood, were sharp at both ends, and were propelled by short "oars" wielded by men standing at each end. He describes the rapids, the waterfalls, the portages and the forts between Albany and Lake Champlain. He mentions many saw mills built at Schuylerville, which, he says, were very profitable. He states that the boards were easily brought to Albany and New York in rafts. (7) A map entitled "Map of the Grand Pass from New York to Montreal." This map was dated about 1756, and is a copy of a map now in the British Museum. It shows the Hudson river from its source to its mouth, and shows the waterfalls, rifts, portages and fortifications between Albany and Lake Champlain. (8) A report of Cadwallader Colden to Governor Clinton, dated August 8, 1751. Colden describes a water journey from Albany to Canada via "Hudson's" river and Wood creek. (9) Certain pages from "Travels in the American Colonies," describing a trip made to Canada by Captain Phineas Stevens in 1752. Stevens tells of two good saw mills at Schuylerville, and "a very pretty little house" belonging to Philip Schuyler. He says that the region along the river from Schuylerville to Stillwater is "all peopling and clearing very fast." (10) Certain pages from the Journey of Colonel James Montresor, under date of June 15, 1759. He says: "Friday, set out from Albany at 10 o'clock with Genl. Gage, Messrs. Napier, Goodin and several other Generals, & came to Van Orman's and got in a whale boat & came to Half Moon and dined at the Widows. Rained & thunder'd. Set out at 4. Came to Still Water. Lay in the Officer's Barracks — No rest for the Rats. Monday-18th. Set out from Fort Miller in a whale boat and came to Fort Edward about 12 at noon." (11) Extracts from journal of General Amherst written in 1759. He says: "I arrived at Albany on the 3rd of May, * * * the 5th I ordered three months provisions for 5,000 Men by land to Schenectady, and as much as could be forwarded by water to Fort Edward." On June first he ordered Montgomery "to take batteaus & provisions & proceed up the River," with troops. (12) Extracts from "A Concise Account of North America," by Major Robert Rogers, published in 1765. Rogers says: "The situation of New York is extremely happy for trade. * * * There are easy conveyances to and from it by water, upon its rivers and lakes (except some few carrying places) to Montreal and Quebec northward, and to the great lakes Erie, Ontario, etc. westward." (13) Certain

**280** Waterford El. L., H. & P. Co. *v.* State of New York.

Third Department, March, 1924. [Vol. 208

pages from " Memoirs of an American Lady," by Mrs. Anne Grant. These describe a journey made by her in the year 1765 up the Hudson river to Canada. She says that the increase of the settlers above Stillwater has become incredibly great; that there are saw mills on every stream; that timber was drawn to the river in sledges; that in the spring the whole neighborhood would put their joint stock into a large raft; that they would float it down the river with a man or two on it. She says: " There is something serenely majestic in the easy progress of those large bodies on the full stream of this copious river. Sometimes one sees a whole family transported on this simple conveyance; the mother calmly spinning, the children sporting about her and the father fishing on one end and watching its safety at the same time. These rafts were taken down to Albany and put on board vessels there, for conveyance to New York." (14) Pages from the journal of Charles Carroll of Carrollton. Carroll describes in detail a journey up the Hudson river from Albany made in 1776. Of the return trip he says: " June 7th. Our servants and baggage being come up, we left Saratoga [Schuylerville] this morning at nine; took boat and went down Hudson's river through all the rapids to Albany. The distance is computed thirty-six miles. We arrived at Albany half an hour past five." He states that General Schuyler informed him " that an uninterrupted water carriage between New York and Quebec might be perfected at fifty thousand pounds sterling expense." (15) Extracts from " Orders [to] Colonel Lewis," dated in the year 1776. They in part read: " The provision goes from hence in batteaus at Half-Moon, from where it is conveyed in carriages to Stillwater. There it is again embarked in batteaus, and transported to the Saratoga Falls. Thence by land across a small portage. Thence by water to Fort Miller Falls. Then across a small carrying place by land, and again by water to Fort Edward. Then by land to Fort George or Fort Ann. From the former by water to the north end of Lake George, and by land to the Saw Mills, whence it is conveyed by water to Ticonderoga. If it goes by the way of Fort Ann, it is there put in batteaus, and conveyed down Wood Creek to Skeen's Falls, and rolled across a small portage to the south end of Lake Champlain, and conveyed by water to Ticonderoga. Between this and Half Moon eleven batteaus are now employed, carrying from 160 to 170 barrels." (15) An extract from a pamphlet of W. Winterbotham, published in 1796, which describes the Hudson river. He there says: " Its whole length is about two hundred and fifty miles; from Albany to Lake George is sixty-five miles. This distance the river is navigable only for batteaux and has two portages occasioned by falls of half

a mile each." (17) Extracts from the " American Gazetteer," published in 1797. It there says: " From Albany to Lake George is 65 miles. This distance the river is navigable only for batteaux, and has two portages occasioned by falls of half a mile each. * * * The advantages of this river for carrying on the fur trade with Canada, by means of the lakes, are very great. Its conveniences for internal commerce are singularly happy. The produce of the remotest farms is easily and speedily conveyed to a certain and profitable market, and at the lowest expense." In addition to the above, extracts from Palmer's " History of Lake Champlain " and from Parkman's " Pioneers of France in the New World " were given. Palmer describes two ancient routes of journeying from Albany to Lake Champlain. Both routes were up the Hudson river by water to Fort Edward. The routes then diverged, one leading by the way of Fort Ann to the mouth of Wood creek, the other passing by the way of Glens Falls to the head of Lake George. Parkman, writing of Champlain's journey in 1609, says: " In the next century this chain of lakes and rivers became the grand highway of savage and civilized war, linked to memories of momentous conflicts." These data, for the compilation of which the Deputy Attorney-General who argued this case deserves much credit, conclusively show that the Hudson river in its natural state was in early times extensively navigated as far north as Fort Edward and Glens Falls. To this extent then the navigability of the Hudson rests upon the solid ground of fact rather than upon judicial pronouncements of a dogmatic nature. Whether the Hudson above Glens Falls, where it begins to take on the character of a mountain stream and becomes comparable to the Raquette, the Saranac and the Black rivers, continues to be navigable, is not determined by the proof, and remains an open question.

That the riparian owners upon fresh water rivers, whether navigable or not, own to the thread of the stream, is a general proposition, which, although denied in *Canal Appraisers* v. *People ex rel. Tibbits* (17 Wend. 571) and in *People ex rel. Loomis* v. *Canal Appraisers* (33 N. Y. 461) is now firmly established in this State. (*Commissioners of Canal Fund* v. *Kempshall*, 26 Wend. 404; *Smith* v. *City of Rochester*, 92 N. Y. 463; *Fulton Light, H. & P. Co.* v. *State of New York*, 200 id. 400; *Danes* v. *State of New York*, 219 id. 67.) *It was held* in the *Tibbits* case, the *Loomis* case, the *Smith* case and the *Danes* case that the bed of the Mohawk river, notwithstanding the general rule, presumptively belonged to the people of the State. *It was said* in these cases as well as in the *Fulton* case, that the bed of the Hudson river above tide water, likewise belonged to the people of the State. All of these cases, however, involved beds of streams

other than the Hudson.   The Court of Appeals has never *directly held,* so far as our examination discloses, that the bed of the Hudson is thus owned.   Its *dicta* to this effect have largely rested upon the authority of the *Tibbits* case and the opinions expressed therein as they appear both in 17 Wendell, 571, and 5 Wendell, 423.   That case involved the middle sprout of the Mohawk river.   Tibbits claimed the bed of the river under a patent to Van Rensselaer of the manor of Rensselaerwyck from the British Crown.   The court reasoned that, since this patent was merely *confirmatory* of an earlier Dutch patent, it must be construed according to the canons of the civil law.   This argument is certainly not persuasive upon the present issue since the patents here are exclusively English.   Indeed, it may be doubted whether lands upon the Hudson north of the confluence of the Mohawk therewith were ever patented by the Republic of Holland.   The court also reasoned that the Legislature of the State of New York by the passage of an act in the year 1792 (Laws of 1792, chap. 40, as amd. by Laws of 1792–93, chap. 8), incorporating one company to improve by canal navigation from the Hudson to Lake Ontario, and another company to make a similar improvement connecting the Hudson with Lake Champlain, wherein it reserved to itself the beds of those streams where not expressly granted, made a declaration of the public ownership of such beds which was conclusive upon others.   The argument that the intent of the Crown in granting a patent in 1704 can be judged by the declaration of the Legislature of the State made in the year 1792 is certainly not impressive.   The patents under which this claimant owned were granted between the years 1665 and 1763.   It would seem equally unreasonable that they should be interpreted through a legislative declaration in the year 1792. The court further argued that the English law in reference to watercourses was unsuitable to this country and, therefore, declared that the people of the State owned the bed of all navigable rivers. This was a declaration which, as we have seen, was afterwards repudiated.   Thus the arguments in the case, which furnished the basis for subsequent pronouncements that the Hudson river bed, as well as the Mohawk river bed, are publicly owned, do not appear abundantly convincing.   However, the *dicta* of the Court of Appeals are weighty, and have been followed by this court. We have already definitely held that the bed of the Hudson river at points between Waterford and Fort Edward is owned by the people.   (*Thompson* v. *State of New York, supra.*)   Such must be the law of this case.

The banks of a river bordering a waterfall furnish land elevations, which, when the banks are tied together by a dam, provide

opportunity abruptly to drop the flowing waters so that useful power may thereby be generated. The river bed merely furnishes a footing upon which to rest the dam. No one owns the flowing water. (*Sweet* v. *City of Syracuse*, 129 N. Y. 335.) " Water is a movable, wandering thing, and must of necessity continue common by the law of nature; so that I can have only a temporary, transient, usufructuary property therein." (2 Black. Com. 18.) " Neither sovereign nor subject can have any greater than a usufructuary right therein." (Per RUGER, Ch. J., in *Smith* v. *City of Rochester*, 92 N. Y. 480.) Since there is no ownership in the waters, who then owns the undeveloped power of a river waterfall? Is it the owner of the river banks? Or is it the owner of the river bed? The Court of Appeals seems to have determined that it is the former rather than the latter. In *United Paper Board Co.* v. *Iroquois Pulp & Paper Co.* (226 N. Y. 38), a case involving riparian rights *upon the Hudson river*, that court said: " The rule of law is familiar that each owner of land contiguous to a natural water course has a right, as owner of such land and as naturally connected with and incident to it, to the natural flow of the stream along his land *and its descent, and all the force to be derived therefrom.*" Again, it said: " The navigability of the river or the ownership of the soil over which the waters flow neither increase nor diminish rights of such a nature." Therefore, irrespective of the question whether the claimant at the time of the appropriation owned the river bed, it would seem that the State, in seizing the banks then owned by the claimant, appropriated an interest of value in an undeveloped water power, and not merely the rock and earth which composed the banks.

The claimant contends that irrespective of its common-law rights, it was the owner of the bed of the river at Van Schoenhoven rapids and above, by virtue of a legislative grant contained in chapter 164 of the Laws of 1901. The material provisions of that act are as follows: " Waterford Electric Light, Heat and Power Company, its successors and assigns, are hereby authorized to construct a dam across the Hudson river on the lands now owned by it or which it shall hereafter purchase or acquire in the towns of Halfmoon, Saratoga county, and Schaghticoke, Rensselaer county, in such a manner as not to injuriously affect the water privilege of the Hudson River Power Transmission Company, and such company is hereby authorized to forever maintain said dam and to flood back up said river so far as it owns or shall hereafter purchase or acquire the adjacent uplands or may have or shall hereafter purchase or acquire the rights of flowage thereon for the purpose of maintaining the pond formed by such dam; and any interests

of the State in lands under the waters of said river covered by said dam or which may be flooded by the erection thereof or under any works which said company shall construct on or adjacent to said dam is hereby granted to said company, its successors and assigns." It is conceded that the descriptions in the act cover the *locus in quo.* The act purports to grant to claimant " any interests of the State in lands under the waters of said river covered by said dam or which may be flooded by the erection thereof." If the act was valid, then the claimant, by virtue of its provisions, did become vested with a proprietary interest in the river. The State claims, however, that the Legislature, through the enactment, attempted to abdicate its governmental powers, and that the act was, therefore, without force.

The State, in its relation to the Hudson river, enjoys a double character. It is the proprietor of the lands under the waters of the river. It is, also, the representative of the public at large, in whom is vested the easement of passage along the stream. If it conveys the under water lands to an individual its act has the quality of an ordinary grant by a land proprietor. If, as the representative of the public, it releases the easement of passage, or if its grant of the land expressly or impliedly carries with it a right to defeat or diminish the public use, it exercises sovereign or governmental powers. (*People* v. *New York & S. I. F. Co.,* 68 N. Y. 71; *Smith* v. *City of Rochester,* 92 id. 463; *Langdon* v. *Mayor, etc.,* 93 id. 129.) It has sometimes been thought that because the King of England, while empowered to convey the bed of navigable waters, could not release the public easement therein, therefore, the Legislature of a State had no such power. This was an erroneous theory. It was said by HAND, J., in *Morgan* v. *King* (18 Barb. 277): " I am aware that it has been said the Crown can not grant a right to obstruct a public navigable river. [*Williams* v. *Wilcox,* 8 A. & E. 314; 3 Kent, 427.] But Parliament can. [Woolr. on Ways, 60; *Rex* v. *Montague,* 4 B. & C. 598. And see *Abraham* v. *Great Northern R. Co.,* 16 Q. B. Rep. 586. *Reg.* v. *Betts,* Id. 1022.] And our Legislature, when acting within the pale of the Constitution, has full power over the matter." It was said by ANDREWS, J., in *People* v. *New York & S. I. F. Co. (supra)*: " But while the sovereign can make no grant in derogation of the common right of passage over navigable waters, Parliament may do so. * *. * The State in place of the Crown, holds the title, as trustee of a public trust, but the Legislature may, as the representative of the people, grant the soil, or confer an exclusive privilege in tide waters, or authorize a use inconsistent with the public right." It was said by EARL, J., in *Langdon* v. *Mayor, etc. (supra,* 155): " The Crown could convey

the soil under water so as to give private rights therein, but the dominion and control over the waters, in the interest of commerce and navigation, for the benefit of all the subjects of the kingdom, could be exercised only by Parliament." It was said by BARTLETT, Ch. J., in *Matter of Long Sault Development Co.* (212 N. Y. 1): "The power of the Legislature to grant land under navigable waters to private persons or corporations for beneficial enjoyment has been exercised too long and has been affirmed by this court too often to be open to serious question at this late day." It is self-evident, however, that the right of the Legislature of the State to release its governmental powers over navigable waters has certain limitations. These are stated by Mr. Justice FIELD in *Illinois Central Railroad* v. *Illinois* (146 U. S. 387) as follows: "But that is a very different doctrine from the one which would sanction the abdication of the general control of the State over lands under the navigable waters of an entire harbor or bay, or of a sea or lake." And, again, he says: "It is only by observing the distinction between a grant of such parcels for the improvement of the public interest, or which when occupied do not substantially impair the public interest in the lands and waters remaining, and a grant of the whole property in which the public is interested, that the language of the adjudged cases can be reconciled." BARTLETT, Ch. J., in *Matter of Long Sault Development Co.* (*supra*), limits the power of the Legislature as follows: "The contemplated use, however, must be reasonable and one which can fairly be said to be for the public benefit or not injurious to the public." He then quotes with approval from *Coxe* v. *State of New York* (144 N. Y. 396), the following: "Grants to the owners of the adjoining uplands, either for beneficial enjoyment or for commercial purposes, have long been authorized and recognized as one of the uses to which the State may lawfully apply such lands." Farnam says: "The limit of this power is the necessity of the case; and until the injury greatly exceeds the public benefit the obstruction will not be interfered with by the courts. It is primarily for the Legislature, and not for the courts, to determine between the conflicting interests and the necessity of requiring the navigation right to yield, and its discretion will not be interfered with by the courts, except in cases of a plain and gross abuse of discretion." (§ 84.)

We have hitherto discussed the question whether the Hudson river between Waterford and Fort Edward was in law a navigable stream. In order to find the solution we considered the uses made of the river when still in its natural state at times now remote. We have here a wholly different question. Did the legislative grant to claimant in the year 1901 unreasonably or substantially

**286** WATERFORD EL. L., H. & P. CO. *v.* STATE OF NEW YORK.

Third Department, March, 1924.                    [Vol. 208

limit navigation upon the Hudson river? Below Waterford there was then a dam at Troy having an elevation of more than twelve feet. From Troy up stream to Fort Edward, a distance of forty miles, the natural rise in the river was 118 feet. Six dams, other than the Troy dam, then stood upon the river bed between these two points. One of these dams had an elevation of fifteen feet. Therefore, at this time, continuous travel upon the river between Troy and Fort Edward had become impossible, and had ceased. Logs either singly or in rafts no longer passed down the stream. Through trips with small craft, whether up or down stream, whether in low water or in high, had been completely barred. On the other hand, the erection of dams had made more feasible the navigation of the waters lying between them. The Van Schoenhoven rapids dropped the river water, as we have seen, nine feet in one-half mile. No freight-laden or passenger-carrying vessels could navigate them, and if in seasons of high water small craft were occasionally floated through them, nevertheless, navigation at this point was at best ephemeral and inconsequential. Therefore, the erection of a dam at Split Rock, which was authorized by the Legislature, could not substantially or unreasonably have impaired navigation. On the other hand, it would have improved navigation upon the stretch of water above to the foot of the dam of the Hudson River Power Transmission Company, four miles away. Indeed, the State itself has seized the claimant's properties for the purpose of *improving* navigation by the erection of such a dam and the consequent raising of the waters above. Therefore, it seems to us that the legislative grant made to the claimant, within all the authorities cited, since it could not materially affect navigation, was a valid grant.

The State also contends that under the River and Harbor Appropriations Act of March 3, 1899 (30 U. S. Stat. as Large, 1151, § 9; U. S. Comp. Stat. 1918, § 9971; Barnes' Fed. Code 1919, § 9437), the claimant could not have built a dam at Van Schoenhoven rapids without a Federal license; that it had no such license; consequently, that when its lands were appropriated the water power seized was valueless. The argument proves too much. Assuming that the act applied to the Hudson river at this point, then, if it barred the erection of a dam by the claimant, it barred the erection of a dam by the State. It is, of course, true that not even the State itself may exercise the power of eminent domain for other than a public purpose. " The general grant of legislative power in the Constitution of a State does not enable the Legislature, in the exercise either of the right of eminent domain or of the right of taxation, to take private property, without the owner's consent, for any but a public object." (Per GRAY, J., in *Cole* v.

*La Grange*, 113 U. S. 1.) The Barge Canal Act (Laws of 1903, chap. 147) directed that the route of the Champlain canal should be as follows: " Beginning in the Hudson river at Waterford thence up the Hudson river canalized to near Fort Edward; thence via the present route of the Champlain canal to Lake Champlain near Whitehall." It empowered the appropriation of " lands, structures and waters " which " for the use of the improved canals " should in the judgment of the State Engineer " be necessary." (See §§ 3, 4, as respectively amd. by Laws of 1921, chap. 687, and Laws of 1913, chap. 801, and intermediate amendments.) If the State had no power to build a dam at Van Schoenhoven rapids, because of the lack of a Federal license, then the acquisition of the lands of the claimant could not be " necessary " " for the use of the improved canals," and a public purpose for which the lands and rights might have been appropriated was non-existent. In this view, the proceedings in condemnation were unlawful; the State has been a trespasser; and the claimant is now the owner of the river banks and bed together with the structures erected thereupon by the State. However, it is clear that the State, as between itself and the claimant, cannot be heard to raise the bar of the Federal act to avoid the payment of compensation, when it has appropriated the claimant's water rights to build, and has actually built, the very dam which it urges was prohibited. Viewed in a practical way the matter stands thus: The State now has a developed water power which is valuable. All that it now has was developed from that which was owned by the claimant. Therefore, the value of the developed power, less the cost of development, is the value of the thing taken from claimant, and should measure the compensation to be paid to it. The State's argument, carried to its logical consequence, would empower the State to appropriate, for purposes other than the improvement of navigation, all the water powers in the State which are situate upon navigable rivers, and enable it, in cases where Federal licenses have not been obtained, to limit the compensation to be paid by it to the value of the uplands taken and no more. We think that the argument should not here prevail to limit the compensation payable to this claimant.

The State further contends that the riparian rights of the claimant were held subject to the paramount right of the State to improve navigation; that the State built the dam at Van Schoenhoven rapids in the exercise of this right; that the claimant is, therefore, not entitled to compensation. In *Commissioners of Canal Fund* v. *Kempshall* (*supra*) the State, in the course of constructing an aqueduct for canal purposes, obstructed a raceway by which water was conducted from the Genesee river to a mill of a riparian

**288** WATERFORD EL. L., H. & P. CO. *v.* STATE OF NEW YORK.

Third Department, March, 1924. [Vol. 208

owner. It was held that the State must respond in damages to the mill owner for the injury done. The court said: " I cannot assent to the position that the conceded common law authority of the State over such rivers for the purposes of navigation, comprehends the right to divert the waters to other purposes of artificial navigation wholly distinct from that of the river itself." In *Fulton Light, H. & P. Co.* v. *State of New York* (200 N. Y. 400) the State appropriated the lands of a riparian owner on the navigable Oswego river for the purpose of filling a canal constructed to enable vessels traversing the river to pass the mill ·dam of the owner. The court held that the claimant was entitled to compensation on account of the diversion of the river waters from their natural course. The court said: " When, however, it is not the channel, or bed, of the river, which is to be regulated, and land is taken and the river waters are diverted for the purpose of constructing and operating some other channel distinct from that of the river, then the limit of the State's authority freely to intrude upon the riparian owner's rights has been reached." The claimant in this case, having been granted the bed of the Hudson river, enjoyed the same rights in respect to the flow of that stream which the riparian owners in the *Kempshall* and *Fulton* cases enjoyed in respect to the Genesee and the Oswego. The State appropriated the claimant's property with the intention of diverting the waters of the Hudson from the natural channel into an artificial channel. It has actually erected a canal and lock which for 5,000 feet carry the river waters outside the bounds of the river so that they no longer pass over the water power site formerly owned by the claimant. The cases cited, therefore, apply to entitle the claimant to compensation. We are not unmindful of the holding in the case of *United States* v. *Chandler-Dunbar Co.* (229 U. S. 53). That case involved the question of compensation to be paid by the United States to a riparian owner whose property had been appropriated by the United States for purposes of navigation. This case involves the question of what the State of New York must pay for an appropriation made by it. Upon that issue the *Chandler-Dunbar* case is not controlling. " The States have authority to establish for themselves such rules of property as they may deem expedient with respect to the streams of water within their borders both navigable and non-navigable, and the ownership of the lands forming their beds and banks." ( *United States* v. *Cress*, 243 U. S. 319, 320.) The courts of this State have determined these rules of property and have decided what the State must pay, and when, in the instances of its seizure of water power rights for purposes of navigation. In these questions the United States has no concern.

It must be borne in mind that the State has not limited itself to the erection of a dam, the construction of a canal and lock, and the diversion of waters sufficient to operate the same. It has seized, for all purposes whatsoever, all the property and rights of the claimant. The claimant may not now enjoy the power taken in subordination to the uses of navigation. It may not make use of the undiverted waters which come to the crest of the dam. The State has become the proprietor of the water power and may employ it for gainful purposes. For the thing of value which it has taken it should, therefore, pay.

This case finds a close parallel in *First Construction Co.* v. *State of New York* (221 N. Y. 295). There the State had granted to the predecessors of the claimant the right to erect wharves upon lands under water in Gowanus bay in Brooklyn, N. Y. The harbor improvement intended to be made was far from being completed when the State of New York made appropriation *for Barge canal purposes* of a portion of the rights conveyed. The lands involved were for the greater part under water lands and unimproved. The Court of Appeals held that the claimant was entitled to compensation for all the under water lands taken whether built upon or otherwise. Chief Judge HISCOCK, writing for the court, after pointing out that in some States the rights granted were held to be mere licenses, revocable at will, said: " I think, however, that the privilege amounts to more than this, and that an act granting the right to fill in lands under water, and thereby acquire title to the same, gives an inchoate, vested interest in the lands described which is a property right and of which, unless forfeited or lost in some way, the grantee *cannot be deprived without compensation.*" And this was the holding notwithstanding that the appropriation made by the State was *for purposes of navigation.* We think that that case is conclusive upon the issue now made.

The question of interest remains. The Court of Claims has found that the lands and flowage rights owned by claimant " constituted one entire property whose most beneficial and valuable use was its employment as a whole for the development of water power," and that " its value depended upon its use as an entirety." The State made twenty-two separate appropriations of parcels of lands owned or controlled by the claimant. Three of these parcels were appropriated in the year 1910, and the remaining parcels were appropriated in the year 1913. Parcel No. 2318 consisted of forty-seven one-hundredths acres owned in fee by the claimant. This parcel is located on the easterly side of the river immediately above the easterly end of the dam which has been erected by the

19

State.   The date of its appropriation was June 13, 1910.   Parcel No. 2402, consisting of six and six-tenths acres, was owned in fee by the claimant, and lies on the westerly side of the river.   It is immediately above the westerly end of the dam which has been erected by the State.   This parcel was appropriated on July 15, 1910.   The ownership of these two parcels by the claimant made possible the erection of a dam and a development of a water power by the claimant.   They were indispensable units in its proposed development.   Therefore, when the State took these parcels, it deprived the claimant of its water power.   We think that the claimant is entitled to interest from June 13, 1910, the earlier of the two dates, and the date of the appropriation of parcel No. 2318.

The judgment should be modified by providing for the payment of additional interest as stated herein, and as modified should be affirmed, with costs.

All concur, HINMAN, J., with an opinion, except VAN KIRK, J., dissenting, with an opinion in which COCHRANE, P. J., concurs.

HINMAN, J. (concurring):

I concur with Mr. Justice KELLOGG because I think we are bound by the holding in *First Construction  Co.* v.  *State of New  York* (221 N. Y. 295).   It is true that above the dam constructed by the State no channel was made separate from the river and waters thereof were not diverted from the stream opposite or above the claimant's lands, as Mr. Justice VAN KIRK says.   The dam erected by the State was needed to accomplish that improvement of navigation in the river itself.   The argument of Mr. Justice VAN KIRK is that this characterizes the act of the State as an exercise of its governmental power to improve navigation; that the claimant accepted its grant subject to the implied right of the State to foreclose the enjoyment of it without compensation, whenever the State saw fit to do so in aid of navigation.   He concedes, however, certain exceptions:   (1) Where the State, in aid of navigation, has made a previous grant in aid of navigation, not an obstruction or hindrance to navigation.   (2) Where the State seeks to divert the water of the stream to aid navigation in an artificial channel and not an improvement of the stream itself for that purpose.

It is assumed by Mr. Justice VAN KIRK that the grant to the claimant was not given in aid of navigation and that the erection of claimant's dam would use the entire stream and constitute an interference with navigation.   It is difficult to see how the original purpose of the grant has any significance, provided the exercise of the right granted accomplishes the very aid to navigation in the channel of the river above the dam now supplied by the State's dam.   The

dam by whomsoever erected would serve the same purpose. Claimant's dam, therefore, would have been in aid of commerce and navigation in this instance even though it occupied the entire stream. It would not have constituted an interference with the very improvement for navigation purposes as to which the State assumed to act. To determine this question rightly, we have the right to assume the possibility of the erection by the claimant on this site of a dam entirely suited to the State's needs. If the claimant's dam had been erected, the State could have taken it; but if that dam accomplished the necessary depth above the dam, the mere taking by the State would not have aided navigation and the State would have had to pay. The logic of the situation is fully seen when we assume the possible erection of this precise present dam by the claimant rather than by the State. By this analysis we see that so far as making the river navigable above the dam, in the manner now accomplished, is concerned, the State has done no more for navigation than claimant could have done. The State could have minimized its own cost of improving navigation by adopting the claimant's improvement without ownership of the dam and by simply controlling the operation of it so as to get the necessary use of the waters for the canal. It could have interfered by simply condemning the necessary land to create a lock at one end of the claimant's dam, using so much water as it needed for navigation. This water it could have used, so far as reasonably necessary for navigation, but under the cases cited by Mr. Justice KELLOGG, if it diverted the waters to use them in an artificial channel below the dam, it would have to pay any damage that was caused to claimant. The net result would be that for perhaps a nominal sum the State in such circumstances would enjoy all that it now enjoys in navigation development, but the claimant would have a valuable water power which in all likelihood would not be interfered with in any substantial degree by the operation of the lock and the supply of water to the artificial canal below the dam. By proceeding as it has, the State has created for itself no greater navigation facilities but a water power which it may use for gainful purposes and of which it has deprived claimant for no reason other than to own the water power itself. Under these circumstances, the mere fact that the activity of the State leading to this appropriation of claimant's property was one primarily in aid of navigation is of no more significance than was given to the activity of the State in the *First Construction Co.* case, where the State appropriated for Barge canal purposes lands under water in Gowanus bay previously granted by the State to private owners upon which to erect wharves. I think this case is governed by that decision.

**292** WATERFORD EL. L., H. & P. CO. *v*. STATE OF NEW YORK.

Third Department, March, 1924. [Vol. 208

VAN KIRK, J. (dissenting):

The claimant, the Waterford Electric Light, Heat and Power Company, purchased and became the owner of the uplands, or the flowage rights upon the uplands, adjoining the Hudson river on either side for a distance of about two miles, which uplands, including those on which it had flowage rights, would be submerged by a dam which it purposed to construct across the Hudson river a short distance above Waterford and at the lower end of its riparian rights. After it had procured a part of these uplands and flowage rights, it procured from the Legislature the enactment of chapter 164 of the Laws of 1901, which became a law March 22, 1901, which act authorized the claimant to construct a dam across the Hudson river on the lands now owned by it, or which it shall hereafter purchase or acquire, and to forever maintain said dam and to flood back up said river so far as it owns or shall hereafter purchase or acquire the adjacent uplands, or the rights of flowage thereon, for the purpose of maintaining the pond formed by such dam; and any interest of the State in the lands under the waters of said river covered by said dam, or which may be flooded by the erection thereof, was granted to the claimant, its successors and assigns. Claimant had paid for its uplands and flowage rights, but paid nothing to the State for that which it received under the aforesaid act of the Legislature.

In 1900, by chapter 411 of the Laws of that year, the State Engineer and Surveyor was required to cause to be made the surveys necessary to determine the cost of constructing the Champlain, Erie and Oswego canals and to make surveys between Watervliet and Fort Edward, " to ascertain whether it will be cheaper to improve the Champlain canal along its present route or to cana'ize the Hudson river between those points." (See §§ 1, 5.) Pursuant to this requirement, and on February 12, 1901, the State Engineer and Surveyor rendered his report setting forth the cost of improving the Champlain canal along the old route through the land and also the cost by way of the Hudson river from Troy to Whitehall. Thereafter the Barge Canal Act (Laws of 1903, chap. 147) was passed, by which the State determined that " the route of the Champlain canal as improved shall be as follows: Beginning in the Hudson river at Waterford, thence up the Hudson river canalized to near Fort Edward." (See § 3.) The plan adopted fixed the canal for the distance of forty miles between Watervliet and Fort Edward, thirty-six miles in the river and four miles outside of the river. Under this act the State has constructed a dam across the Hudson river, slightly below the site chosen by this claimant for its dam, and has in consequence flooded the uplands and the lands on which claimant had flowage rights. The claimant then filed its claim and has procured an

award in its favor for its property so taken by the State in the sum of $250,000, with interest from June 30, 1913. The award was made as compensation from the State for " the value of its [claimant's] lands and flowage rights which have been appropriated by the State as that value has been enhanced by the franchise granted by chapter 164, Laws of 1901." The court held: " In fixing the value of claimant's lands and flowage rights which have been appropriated by the State, claimant is entitled to have considered as an element of value the franchise to build a dam in the river, which was granted by chapter 164, Laws of 1901." And the court further found that said chapter " granted to claimant a franchise to construct and maintain a dam in the Hudson river opposite and adjacent to its uplands which it owned at the time of the passage of the act, or might thereafter acquire, which franchise, having been accepted and acted upon, cannot be revoked or destroyed without compensation," and found that " The lands and flowage rights owned by claimant, considered either as one entire property or as several separate parcels, were of relatively slight value without the franchise granted by chapter 164 of the Laws of 1901. The franchise greatly enhanced the value of said lands and flowage rights."

It is not questioned that the claimant is entitled to compensation from the State for its uplands and flowage rights on uplands, together with such consequential damages to its remaining uplands, if any, as it has suffered. The question presented is whether or not it is entitled to compensation for such value as its so-called franchise has in connection with these lands. In other words, whether or not the claimant is entitled to recover, in addition to just compensation for its uplands and flowage rights, an increased amount because of its alleged " franchise to build a dam."

That the Hudson river, at the place in question, above tide water, is a public navigable stream in law, is not open to question in this court (*West Virginia Pulp & Paper Co.* v. *Peck*, 189 App. Div. 286; *Thompson* v. *Fort Miller Pulp & Paper Co.*, 195 id. 271; *Thompson* v. *State of New York*, 204 id. 684), or in the Court of Appeals as we understand the decisions. (*Fulton Light, H. & P. Co.* v. *State of New York*, 200 N. Y. 400, 413; *Danes* v. *State of New York*, 219 id. 67, and cases cited.) And by the evidence painstakingly prepared the Attorney-General has shown that it has been and is in its ordinary and natural condition navigable in fact. Title to its bed is in the State, except where there has been an express and direct grant from the sovereign of the bed of the stream. (*Williams* v. *City of Utica*, 217 N. Y. 162.) Prior to the act of 1901 (*supra*) the title to the bed of the Hudson river had not been conveyed by the State to the claimant or its predecessors in title.

In each grant, under which title to the bed is claimed, the lands are bounded by or upon the navigable river and in such description no part of the bed of the stream is included. It could not build a dam across the stream without license from the State. (*Fort Plain Bridge Co.* v. *Smith*, 30 N. Y. 44.) So that claimant's interest or right in the bed of the stream is such only as it had under the act of 1901.

The power to improve public streams for navigation purposes belonged to the people of the State when the Federal Constitution was adopted; the State or its people did not surrender this right and still have it.

A riparian owner on a navigable stream, having also title to the bed of the stream, has not that full, complete title to the submerged lands which he has to his uplands; it is a qualified title. The rights of the riparian owner in a stream and in the submerged lands under a stream are aways subject to the paramount right of the State. (*Union Bridge Co.* v. *United States*, 204 U. S. 389, 392, 398, 399; *Gibson* v. *United States*, 166 id. 269, 271; *United States* v. *Chandler-Dunbar Co.*, 229 id. 53, 70.) Acts done by the State in the proper exercise of its governmental power to improve a public stream for navigation and commerce, which impair or destroy the use by a riparian owner of his rights in the stream or in the lands under the stream are not a taking of private property for the public use within the meaning of the constitutional limitation; and the consequences of such acts do not entitle the owner of such rights in the stream or its submerged lands to compensation from the State or its agents, or give to the riparian owner any right of action therefor. (*Union Bridge Co.* v. *United States, supra*, 390; *Transportation Co.* v. *Chicago*, 99 U. S. 635; *Sage* v. *Mayor*, 154 N. Y. 61, 77.) The loss of the rights in the stream in the submerged lands is merely incidental to the exercise of a servitude to which the property had always been subject; the servient right exists so long only as the dominant right is not exercised; when the dominant right is exercised to the damage of the servient right, the latter is not taken; it expires. Riparian ownership is subject to the obligation to suffer the consequences of the improvement of navigation in the exercise of the dominant right of the government in that regard. The right of navigation rests in the waters of the stream and not in its submerged lands and no burden in the form of damages, as compensation for the value of a subservient right, rests upon the government because of the exercise of its dominant right; the State cannot be so crippled in the exercise of its sovereign powers. The rights in a public stream belonging to the riparian owner, or the owner of the bed of the stream, are held with knowledge that those rights may be lost when the dominant right is exercised. When the State improves a public stream

for the public good it acts solely in the interests of the public and not with any intent to destroy any right of a riparian owner. ( *Union Bridge Co. Case, supra.* )

Unless, therefore, the act of 1901 (*supra*) gave to the claimant some special property right, a property right other than the riparian owners who own the submerged lands of a public stream have, the act of the State in determining to improve the Hudson river and in so doing did not take the rights of the claimant in the stream within the meaning of the Constitution (Art. 1, § 6) requiring compensation for the taking of private property for the public use.

It is to be noted that there was nothing in this act of 1901, chapter 164, limiting the power of the State, should occasion arise, to improve the stream for navigation and commerce. The passage of the act and the granting of the rights therein described did not and could not legally limit this power of the State. ( *Union Bridge Co. Case, supra,* 395.) " The so-called *jus privatum,* or absolute ownership of lands under navigable waters, together with the exclusive privilege in the waters themselves, which attached to the English crown, resides in the people in their sovereign capacity and cannot be conveyed for private purposes." (*Appleby* v. *City of New York,* 235 N. Y. 351, 362.)  The right to control navigation upon the public waters of the State remains in the State to be exercised in the public interest. (Id.)  " ' The State can no more abdicate its trust over property in which the whole people are interested, like navigable waters and soils under them, so as to leave them entirely under the use and control of private parties, except in the instance of parcels mentioned for the improvement of the navigation and use of the waters, or when parcels can be disposed of without impairment of the public interest in what remains, than it can abdicate its police powers in the administration of government and the preservation of the peace.' " (*Matter of Long Sault Development Co.,* 212 N. Y. 1, 10.)

What then of the grant of the right to build a dam? In *Stone* v. *Mississippi* (101 U. S. 814) the State had granted a charter to a private corporation to conduct a lottery for a period of twenty-five years, for which the corporation paid to the State a valuable consideration in money. The following year by an amendment to the State Constitution the Legislature was forbidden to authorize any lottery. The corporation was then forbidden to further operate its lottery. The court held that in this there was no violation of that provision of the United States Constitution (Art. 1, § 10, subd. 1) which prohibits a State from passing any act which impairs the obligation of contracts. It said (p. 819): " No Legislature can bargain away the public health or the public morals. The people themselves cannot do it, much less their servants. The supervision

of both these subjects of governmental power is continuing in its nature, and they are to be dealt with as the special exigencies of the moment may require. Government is organized with a view to their preservation, and cannot divest itself of the power to provide for them." It further said (p. 821): "All that one can get by such a charter is a suspension of certain governmental rights in his favor, subject to withdrawal at will. He has in legal effect nothing more than a license to enjoy the privilege on the terms named for the specified time, unless it be sooner abrogated by the sovereign power of the State." Rights arising from contracts with the State are subject to regulation for the protection of its sovereign power. (*Mugler* v. *Kansas,* 123 U. S. 665.) In *Chicago, B. & Q. Railway* v. *Drainage Comrs.* (200 U. S. 561) it was held where a bridge had been lawfully constructed under the Farm Drainage Act of the State of Illinois and it became necessary that this bridge be removed and larger openings made for an increased volume of water, that it was the duty of the railway company at its own expense to remove the present bridge and also, unless it abandoned or surrendered its right to cross the creek at or in that vicinity, to erect at its own expense and maintain a new bridge in conformity with the regulations established by the drainage commissioners under the authority of the State; and that such requirement, if enforced, would not amount to a taking of private property for a public use within the meaning of the United States Constitution, nor to a denial of the equal protection of the laws. (See U. S. Const. 14th Amendt. § 1.)

The grant to this claimant of the privilege of building a dam in the river was a license or privilege only, subject to be repealed or revoked whenever, in the interests of the public, the State should determine to improve the Hudson river for purposes of navigation and commerce; it was not a contract by which it bargained away its sovereign powers. (*Matter of Long Sault Development Co., supra.*) This claimant accepted the grant, knowing that this was the nature and extent of its rights. The injury to these limited private rights claimed in the stream, at least before they have been exercised, must be deemed incidental to, and to have resulted from, the exercise of the governmental function, reasonably exercised for the public good, and the claimant is not entitled to compensation therefor. It is established by a long line of decisions (in addition to those above cited) that " injury may often come to private property  *  *  * taken for the public good and for no other purpose, and yet there will be no *taking* of such property within the meaning of the constitutional guarantee  *  *  * against the taking of private property for public use without compensation." (*Chicago, B. & Q.*

*Railway* v. *Drainage Comrs.*, *supra*, 584; *New Orleans Gas Co.* v. *Drainage Comm.*, 197 U. S. 453; *West Chicago Railroad* v. *Chicago*, 201 id. 506; *Lake Erie & W. R. Co.* v. *Smith*, 61 Fed. Rep. 885; *State of Indiana* v. *Lake Erie & W. R. Co.*, 83 id. 284.)

In *Fulton Light, H. & P. Co.* v. *State of New York* (200 N. Y. 400), which arose on the Oswego river, and in *Commissioners of Canal Fund* v. *Kempshall* (26 Wend. 404), which arose on the Genesee river, the court held that the action of the State complained of was a diversion of the water of the stream to aid navigation in an artificial channel and was not an improvement of the stream in the public interest; that the State could do the act under its sovereign right of eminent domain, but not under its sovereign power to improve navigation and commerce; in consequence that the claimants were entitled to compensation for the resulting damages. But in the instant case the rights of the claimant have not been so destroyed or diminished. The State built its dam a little distance below the point at which claimant says it intended building its dam. It constructed headgates at the end of this dam, through which water is let into a canal, all of which is below the dam. This canal extends for some 2,700 feet, partly in a cut through the uplands and partly in a channel of the river. Above the dam, for a short distance, the river bank was cut or shaved off, but no channel was made separate from the stream opposite or above the claimant's lands. It was the construction of the dam by the State which has deprived the claimant of the opportunity to exercise its right to build a dam in the stream and this construction was a part of a comprehensive plan to canalize the river to improve navigation and commerce in the stream.

It is not believed that any of these conclusions are in conflict with the holding in *First Construction Co.* v. *State of New York* (221 N. Y. 295). In that case the harbor and pier lines had been established in the tideway and grants to the several shore owners gave the right to construct piers and docks and to fill in from the shore, within a general scheme for improving the harbor and constructing the Brooklyn basin; such a grant is in aid of commerce and navigation, not an obstruction or hindrance to navigation, and the court intimates that there is some consideration therefor in that the individual pays the cost of harbor construction rather than the public. It was said no controlling authority holds that " the grant of a mere privilege to fill in tidewater lands, so long as unexercised, conveys title;" that such grants, while they do not convey title, may not be revoked at will, though they may be lost or revoked for nonuser; they may not be arbitrarily taken without compensation and, when exercised, will mature into title in the grantee. This I understand was held because the grant was in aid of navigation. The privilege of building

a dam, which the claimant demands now, might not be exercised and enjoyed without substantial interference with the improvement of the navigation of the stream which the State has completed. The weight of authority is that the State may not grant the navigable waters for private purposes, but it may under some circumstances in aid of navigation. " The right of the grantee to fill in his land under water with solid filling * * * is a delegated exercise of the public right in aid of commerce and subject to the prior exercise of the public right to regulate navigation directly. The grant for beneficial enjoyment is a grant in aid of commerce." (*Appleby* v. *City of New York, supra,* 362, 363; *Matter of Long Sault Development Co., supra.*)

I have believed that the canalizing of the Hudson river is an improvement thereof by the sovereign State in the public interest for the purposes of navigation and commerce. If it is not, a vast amount of discussion in this case is wasted. The fact that the State has decided to construct the canal for short distances outside of the river to shorten or straighten the route does not change the character or purpose of this work. Nor is there force in the claim that the dam constructed is an obstruction to the navigation of the stream. The State has determined upon its plan for improving the stream and its determination is conclusive. The construction of the dam is an essential part of this plan of improvement. It was built for this sole purpose and there was no intent thereby, as the concurrent opinion says, to create " a water power which it [the State] may use for gainful purposes and of which it has deprived claimant, for no reason other than to own the water power itself." The claimant had built no dam or any part of a plant, nor did it give any evidence of an intent to build, though ten years went by after the act of 1901 became a law before the State built. During these years the claimant was in no wise restrained from building by anything stronger than apprehension. This was a long nonuser. The State was not called upon to wait its public work until claimant decided to act. It expended its money and built the dam when the necessity arose, as it, performing a sovereign act, had a right to do. It is a mistake to argue that, if claimant had built a similar dam on this location, it would have answered the same purpose as the State dam and so the grant to it is in aid of navigation. There was no such intent when the grant of 1901 was made. It was exclusively for a private purpose. That purpose or intent is not changed because in the course of events the dam, if claimant had built one, might serve another purpose. The grant of 1901 was in no sense in aid of navigation.

It has not yet been held that, by building a dam in a public stream, the State deprives any riparian owner of his water power

in the stream opposite his premises.   At Thomson in Washington county the State built a dam across the Hudson river when the old Champlain canal was first constructed, in aid of the canal; for many years the Iroquois Pulp and Paper Company and the United Paper Board Company have used the waters from above this dam through a canal on their premises and they are so using it to-day without interference from the State.   That a riparian owner along a public stream has the right (save where its enjoyment conflicts with the exercise of the sovereign power) to use the water power opposite or over his lands, and that the ownership of the submerged bed of the stream neither increases nor diminishes this right, so far as we know, has never been questioned.   (See *United Paper Board Co.* v. *Iroquois Pulp & Paper Co.*, 226 N. Y. 38.)   Had the claimant built its dam and plant before the State built, it would have been in a like position with the West Virginia Pulp and Paper Company at Mechanicville, which is to-day using waters of the stream for power.   (See *West Virginia Pulp & Paper Co.* v. *Peck, supra.*)

What damages could have been allowed to the claimant, had it constructed its dam and plant prior to the improvement of the river by the State, or whether the State, under its power of eminent domain, has taken more of claimant's uplands above the flowage line of the pond than was necessary for its purpose and has thereby deprived the claimant as a riparian owner of its right to use the waters of the stream as it passes its premises, in so far as that use does not conflict with the right of the State, are questions not before the court on this appeal.   The Court of Claims has not considered either of these elements in awarding damages and I do not understand that the proofs are in the case upon which this court could fix the amount of damage, if it thought an award on either ground might be made.   The sole question here, as above stated, is whether or not damages may be allowed because claimant has been deprived of its so-called franchise right to build a dam across the Hudson river near the location of the State dam.

The judgment should be reversed and the case remitted to the Court of Claims to determine the value of the uplands and the flowage rights, with consequential damages, if any, for which claimant is entitled to compensation, which compensation shall not be increased by reason of any property right or privilege to build a dam granted to the claimant under the act of 1901.

COCHRANE, P. J., concurs.

Judgment modified by providing for payment of an increased sum for interest, as indicated in the opinion of H. T. KELLOGG, J., and as modified affirmed, with costs.